## LAKE ERIE POWER & LIGHT CO v TELLING-BELLE VERNON CO

Ohio Appeals, 8th Dist, Cuyahoga Co

No 15660.   Decided Feb 18, 1937

KLINGER, PJ, and GUERNSEY, J, (3rd Dist), and HORNBECK, J, (2nd Dist) sitting by designation

## OPINION

By GUERNSEY, J.

The appellant, The Lake Erie Power & Light Company, plaintiff in the Common Pleas Court, brings this appeal on a question of law from the decision rendered by the court below in favor of the defendant, The Telling-Belle Vernon Company, appellee herein. The appellant will be referred to as plaintiff, and the appellee will be referred to as the defendant.

The case was submitted to the court below upon the pleadings, a stipulation of facts, and written briefs. The stipulation of facts sets forth that the plaintiff is a public utility and electric company, as defined in §§614-2 and 614-2(a) GC. It is an Ohio corporation with its principal place of business in the City of Cleveland, operating wholly in Ohio and serving approximately 9700 customers, including municipalities, private residences, stores and industrial plants. The defendant also is an Ohio corporation with its principal place of business in Cleveland, and at the time mentioned in this case operated a plant at Clarksfield, Huron County, Ohio.

On April 20, 1928, plaintiff and defendant entered into a written contract for a period of ten years, copy of which is attached to the stipulation as Exhibit A. Under its terms, plaintiff agreed to furnish and defendant agreed to purchase for its Clarksfield plant, 3-phase power, secondary service at 220 volts. The provisions of said contract as to rates are as follows:

"1. This contract is for 3 phase power to be furnished by the company and purchased by the consumer at the rates and on the terms and conditions contained in the company's schedules, rules or regulations applicable to the class of service supplied hereunder as now or hereafter filed with the Public Utilities Commission of Ohio, and the terms and conditions herein and upon the back hereof stated.

"2. Nothing herein contained is intended to or shall be construed to alter, nullify or

Baker, Hostetler, Sidlo & Patterson, Cleveland, for plaintiff-appellant.

Ford & Kiefer, Cleveland, for defendant-appellee.

suspend any schedules, rules or regulations, of the company now or hereafter filed with the Public Utilities Commission of Ohio, and in the event of any conflict between the contract and said schedules, rules and, or regulations, the latter shall control."

With reference to duration, the contract declared:

"2. This contract shall continue for a period of ten (10) years from the date hereof, and thereafter until either party shall have served upon the other a sixty day written notice of its election to discontinue the same."

It was provided in the contract that the horse power connected for determining the minimum charge was 25 horse power. At the time the contract was entered into plaintiff had on file with the Public Utilities Commission of Ohio certain schedules of uniform rates covering the service of the class provided for under the contract between plaintiff and defendant. In each of these schedules is the following provision:

"Minimum charge, 75 cents per month, per H.P. connected."

During the year 1928, plaintiff entered into thirteen alleged contracts in the form referred to in paragraph 3, and known as Exhibit B, for three-phase power, to be furnished to customers, both urban and rural. Of these thirteen alleged contracts, twelve were executed for a period of ten years, one for a period of five years. Of the twelve alleged contracts for ten years two did not involve any specific cost of construction or extension or equipment at all, ten involved a cost of extension varying from $32.80 in one case to $1868.00 in another case. The number of years provided by these thirteen alleged contracts executed by three-phase customers of the plaintiff during the year 1928, was determined by mutual agreement between the plaintiff and each customer. One of the thirteen alleged contracts referred to as being signed in 1928, was the one signed by the defendant herein referred to in paragraph 2, and marked Exhibit A in these stipulations.

The petition alleged and the stipulation of the parties agreed, that in addition to the schedules of rates mentioned, plaintiff had also filed with the Public Utilities Commission of Ohio on January 13, 1927, the form of contract which it used when entering into agreements with its customers. Exhibit B attached to the stipulation is a, true and correct copy of said form of contract on file with the Commission at all times since January 13, 1927. There is no dispute about the fact that this form of contract filed with the Commission is an exact copy of the contract actually entered into between plaintiff and defendant, the only difference being that in the contract filed with the Commission the name of the consumer, designation of power, period of years, description of service, point of delivery, horse power connected, date and signatures were blank.

At the time that the contract was entered into between plaintiff and defendant, the power transmission lines of plaintiff did not run along the property of defendant and in order to provide electric energy to defendant, plaintiff was required to construct additional power lines to the defendant's plant, consisting of approximately five and one-half miles of third wire and two miles of three-phase line. This new construction was made at a cost of $1,868 to plaintiff. After completion of the new construction, plaintiff sold electric energy to defendant under the contract up to and including December 16, 1929, and at all times thereafter it is admitted that plaintiff has been ready, willing and able to perform its part of the contract. In the latter part of December, 1929, the defendant discontinued the operation of its Clarksfield plant and has failed to use or purchase electric energy from the plaintiff since that time. On January 4, 1930, the defendant notified plaintiff that the closing of its plant at Clarksfield would no doubt be permanent and since that time defendant has failed and refused to make further payments to plaintiff under the contract. Defendant has admittedly paid to plaintiff a total of $740.95 under the contract, of which amount $638.45 represents energy charges for 21,920 killowatts of electrical energy, and $102.50 represents minimum charges paid during the months when the electric energy consumed at defendant's Clarksfield plant amounted to less than the $18.75 per month minimum provided in the contract (25 horse power at 75 cents per horse power per month). The sums paid by defendant, including minimum charges, represent amounts payable under the contract from April 20th, 1928, to March 1, 1930, but no payments hereafter.

By the terms of the contract, defendant is obligated to pay the minimum sum of $18.75 per month until the expiration of the ten-year period provided in the contract. (April 20, 1928 to April 20, 1938). Plaintiff filed

this suit against defendant for judgment in the sum of $1,837.50, being the amount due from defendant to plaintiff on the basis of minimum monthly payments of $18.75 per month from March 1, 1930 to April 20, 1938, interest on said sum being prayed for at six per cent from March 1, 1930.

Defendant's answer, after admitting various allegations of the petition, declared:

"Defendant further affirmatively alleges that the alleged contract between the plaintiff and the defendant was not filed with the Public Utilities Commission of Ohio, * * *. Defendant further avers that if it should appear that said contract, as alleged in plaintiff's petition, was entered into between the plaintiff and defendant, that said contract is and was unlawful and unenforceable, and that the plaintiff did not comply with the specific requirements of the statutes of the State of Ohio governing public utilities and contracts entered into by them in connection therewith."

Plaintiff filed a reply denying all allegations in defendant's answer, except those specifically admitting the truth of certain allegations in plaintiff's petition.

Upon the trial in the Common Pleas Court the defendant did not deny that it had breached its contract, but relied solely on the defense that under the Ohio statutes, unless the actual contract entered into by a public utility is filed with the Public Utilities Commission, the contract is invalid and unenforceable. Plaintiff, on the other hand, contended that the Ohio statutes do not require such contracts to be filed with the Public Utilities Commission, and that if the Ohio statutes do require such contracts to be filed, then plaintiff made substantial compliance with the statute by filing with the Commission its schedule of rates and the form of contract which it employs. The trial court entered a finding for defendant, thereby holding in effect that despite the admitted breach of contract on defendant's part plaintiff was barred from recovery because the actual contract was not filed with the Public Utilities Commission.

The question involved is whether the right of plaintiff to recover for an admitted breach of contract on the defendant's part is barred because the actual contract between plaintiff and defendant was not filed with the Public Utilities Commission.

Plaintiff in its brief, urges three reasons for reversing the court below:

1. The Ohio statutes which are determinative of the present question do not require the filing of the contract here in dispute as a prerequisite to bringing suit thereon;

2. It is unnecessary, in order to bring suit, that the actual contract shall have been filed with the Public Utilities Commission;

3. Even if the actual contract should have been filed with the Commission, failure to file it does not render the contract void and ought not to bar recovery on plaintiff's part, in a suit of the nature here involved. This is particularly true in the present circumstances, where, under any view of the case, substantial compliance with the statutes has been observed by plaintiff.

These will be considered in the order mentioned.

1. The Ohio statutes place definite restrictions upon public utilities, particularly with reference to the rates to be charged customers. Thus, by §614-14 GC, it is provided that no public utility shall, directly or indirectly, or by any special rate, rebate or other device, charge or receive from any customer either greater or less compensation for services rendered than it charges or receives from any other person for doing a like and contemporaneous service under the same circumstances and condition. By §614-15 GC no public utility is permitted to make or give any undue or unreasonable preference or advantage to any person, firm or corporation or locality, or subject the same to any undue or unreasonable prejudice or disadvantage.

By §614-16 GC printed schedules of rates are required to be filed, it being declared:

"Every public utility shall print and file with the commission, within ninety days after this act takes effect, schedules, showing all rates, joint rates, rentals, tolls, classifications and charges for service of each and every kind by it rendered or furnished, which were in effect at the time this act takes effect, and the length of time the same has been in force, and all rules and regulations in any manner affecting the same. Such schedules shall be plainly printed and kept open to public inspection. The commission shall have power to prescribe the form of every such schedule and may, from time to time, prescribe, by order, changes in the form thereof. The commission may establish rules and regulations for keeping such schedule open to public inspection, and may, from time to time, mod-

ify the same. A copy of such schedules or so much thereof as the commission shall deem necessary for the use and information of the public, shall be printed in plain type and kept on file or posted in such places and in such manner as the commission may order."

No different rate shall be charged than the scheduled rate on file with the Commission according to §614-18 GC, which reads: "No public utility shall charge, demand, exact, receive or collect a different rate, rental, toll or charge for any service rendered, or to be rendered, than that applicable to such service, as specified in its schedule filed with the commission and in effect at the time. Nor shall any public utility refund or remit directly or indirectly any rate, rental, toll or charge so specified, or any part thereof, nor extend to any person, firm or corporation, any rule, regulation, privilege or facility except such as are specified in such schedule and regularly and uniformly extended to all persons, firms and corporations under like circumstances for the like, or substantially similar, service."

Changes in rates are governed by §614-20, GC, which declares in part: "No rate, joint rate, toll, classification, charge or rental or any change in rate, joint rate, toll, classification, charge or rental or any regulation or practice affecting any rate, joint rate, toll, classification, charge or rental of a public utility shall become effective until the commission, by order, shall determine the same to be just and reasonable, except as hereinafter provided, * * *"

"Any such public utility desiring to establish any rate, joint rate, toll, classification, charge or rental, or to modify, amend, change, increase or reduce any existing rate joint rate, toll, classification, charge or rental, or any regulation or practice affecting the same, shall file a written application with the commission. Such application shall be verified by the president or a vice-president and the secretary or treasurer of the applicant and shall contain a schedule of the existing rate, joint rate, toll, classification, charge or rental, or regulation or practice affecting the same, if any, together with a schedule of the modification amendment, change, increase or reduction sought to be established, and also a statement of the facts and grounds upon which such application is based. * * * "

It is further provided in said section that unless the application is one for an increase in rate, the Commission shall permit the filing of the schedule and fix the time when the rates therein specified shall take effect. If, however, the application provides for an increase in rates, an investigation and hearing shall be held by the Commission.

One other section is to be noted—a section stressed particularly by the defendant. This is §614-17 GC which in its amended form became effective August 9, 1927, which was prior to the date of the contract involved in this case. This section reads as follows:

"Nothing in this act shall be taken to prohibit a public utility from filing a schedule or entering into any reasonable arrangement with another public utility or with its customers, consumers or employees for the division or distribution of its surplus profits or providing for a sliding scale of charges, including variations in rates based upon stipulated variations in cost as provided in the schedule or arrangement, or providing for a minimum charge for service to be rendered unless such minimum charge is made or prohibited by the terms of the franchise, grant or ordinance under which such public utility is operated, or providing for a classification of service based upon the quantity used, the time when used, the purpose for which used, the duration of use, and any other reasonable consideration or providing any other financial device that may be practicable or advantageous to the parties interested. **No such arrangement, sliding scale, minimum charge, classification variable rate, or device shall be lawful unless the name shall be filed with and approved by the commission.** Every such public utility is required to conform its schedules of rates, tolls, and charges to such arrangement, sliding scale, classification or other device, and where variable rates are provided for in any such schedule or arrangement, the cost data or factors upon which such rates are based and fixed shall be filed with the commission in such form and at such times as the commission shall direct and determine.

Every such arrangement, sliding scale, minimum charge, classification, variable rate or device shall be under the supervision, and regulation of the commission, and subject to change, alteration or modification by the commission."

It is upon the provision contained in the above emphasized sentence of §614-17 GC, the defendants contend and the lower court found, that the contract constituting the arrangement between the plaintiff and the defendant, was unlawful insofar as, the time of duration is an element of the rates including the minimum rates to be charged thereunder by reason of the failure to file the same with the Public Utilities Commission therein provided.

In this case we are concerned solely with the question involving a rural customer under rates established by the utility company through filing its schedules with the Commission as required by §614-16 GC or if original schedules were changed, then under §614-20 GC.

There is no provision in either of these sections for the filing of blank contract forms such as plaintiff's Exhibit B. §§614-17 and 614-19 GC relate to actual executed contracts and §614-19 GC refers only to contracts in existence prior to the passage of the Public Utility Act, and has no bearing on the problem involved in this case. §614-19 GC also refers to contracts but it applies only to contracts between two utility companies. Consequently, if the plaintiff is to prevail in its contention the contract (Exhibit A of the stipulation) must be justified under §614-17 GC or the plaintiff must sustain its contention under the schedule of rates (Exhibits C to F) without reference to Exhibit A.

The stipulations specifically state that Exhibit A was not filed with or approved by the commission as provided in §614-17 GC. Therefore, plaintiff makes no claim for Exhibit A under the provisions of that section. As to Exhibit B, the same situation exists, except that Exhibit B as a blank contract form was filed with the commission, attached to rate schedule, but no contention is made that as such it was ever approved by the commission. Then the plaintiff is confined to maintaining its claim under the rate schedules filed as Exhibit C and F, which provide for a monthly minimum charge of seventy-five cents (75c) per month per horse power connected.

. It will be noted that under these schedules the duration of time of service is not made a factor of the rate provided. Duration of time of service is a factor of the rate provided in the contract upon which this action is based, and is the factor of the rate upon which plaintiff's right to recovery is wholly dependent. As time of duration of service is a factor of the rate

provided in the contract it does not come within terms of the schedules filed but constitutes variation from such schedules coming within the purview of §614-17 GC.

And as such rate is embodied in the contract entered into between the public utility and the customer, such contract constitutes an arrangement, within the meaning of such section, which is unlawful unless the same shall be filed with and approved by the Commission.

As such arrangement embodied in the contract is, under the provisions of §614-17 GC, unlawful unless filed with and approved by the commission and such arrangement was not filed with or approved by the commission, the plaintiff was not entitled to maintain suit to recover the minimum rate for the stipulated duration of time of service under the contract, where under the rate schedules filed by plaintiff under the provisions of §§614-16 and 614-20 GC, duration of time of service is not made a factor in the rates filed. The Marion Steam Shovel Co. v The Columbus, Delaware & Marion Elec. Co., 28 Oh Ap 351 (6 Abs 561).

As to plaintiff's second reason for reversal.

2. While it may have been unnecessary to file and have allowed the contract itself under the provisions of §614-17 GC, it was necessary to file and have allowed the details of the arrangement and rate embodied in the contract, in order to maintain suit for such minimum rate for the stipulated ten year period of service, and as this was not done suit does not lie.

3. As to plaintiff's third reason for reversal.

Public utility companies under the laws of Ohio are controlled exclusively by statute in their relationships with consumers or users, and where a rate sought to be charged to consumers outside of a municipality does not come within the schedules of rates filed by the utility under the provisions of §§614-16 and 614-20 GC, unless the arrangement embodying such rate is filed with and approved by the Public Utility Commission pursuant to the provisions of §614-17 GC, such arrangement and rate is specifically made unlawful, and suit cannot be maintained for its recovery.

For the reasons mentioned, we find no

error and the judgment of· the Common Pleas Court will, therefore, be affirmed.

KLINGER, PJ, and HORNBECK, J, concur.