[This decision has been published in *Ohio Official Reports* at 92 Ohio St.3d 234.]

ASHLAND CHEMICAL COMPANY, APPELLANT, *v*. JONES, DIR., APPELLEE.

[Cite as *Ashland Chem. Co. v. Jones*, 2001-Ohio-184.]

*Environmental protection—Ohio Adm.Code 3745-21-07(G)(2) does not apply to a chemical distribution facility that stores, transfers, and ships photochemically reactive materials to its customers.*

(No. 00-1154—Submitted April 4, 2001 at the Lawrence County Session— Decided July 11, 2001.)

APPEAL from the Court of Appeals for Franklin County, No. 99AP-764.

_____

**FRANCIS E. SWEENEY, SR., J.**

{¶ 1} Appellant, Ashland Chemical Company, owns and operates a chemical distribution facility on Darrow Road in Akron, Ohio. Appellant uses the facility to store, transfer, and ship various chemical products to its customers. The stored chemicals are transferred from stationary tanks or tank cars into smaller, portable containers in accordance with customer specifications. To accomplish this task, three container-filling lines pump various types of chemicals, including liquid organic materials such as photochemically reactive materials, into the smaller containers. No coating operations, chemical manufacturing, or chemical reaction takes place at this facility.

{¶ 2} On October 6, 1995, appellant submitted an application for a permit to install ("PTI") these lines. Appellee, the Director of Environmental Protection, granted these applications on March 13, 1996. Thereafter, on June 25, 1996, appellant submitted applications for three permits to operate ("PTO") the lines. The applications were forwarded to the Akron Regional Air Quality Management District ("Akron Agency"), the local air pollution control agency, for initial review. In reviewing the applications, the Akron Agency determined that the three PTOs

were subject to Ohio Adm.code 3745-21-07(G)(2), an administrative rule that regulates the amount of organic compounds, including hydrocarbons and photochemically reactive materials, that can be discharged into the atmosphere per hour and per day. The prior PTIs had not stated that the lines would be subject to this rule. The Akron Agency submitted its recommendations to appellee, and appellee incorporated the administrative rule into the draft PTOs.

{¶ 3} When appellant received a copy of the draft PTOs, it objected to the proposed enforcement of Ohio Adm.code 3745-21-07(G)(2) on the ground that it did not believe its facilities fell within the scope of the rule. After receiving appellant's written comments, the Akron Agency agreed to remove any reference to Ohio Adm.code 3745-21-07(G)(2). However, appellee disagreed and ultimately issued the PTOs subject to the requirements of Ohio Adm.code 3745-07-21(G)(2).

{¶ 4} Appellant filed an appeal with the Environmental Review Appeals Commission ("ERAC"), disputing the applicability of Ohio Adm.code 3745-07-21(G)(2). Following a hearing, ERAC concluded that the administrative rule did not apply to the container-filling lines at the Darrow Road facility, and ordered that mention of this rule be removed from the PTOs. Appellee appealed to the Tenth District Court of Appeals, which overruled ERAC's decision. The cause is now before this court upon allowance of a discretionary appeal.

{¶ 5} We are asked to decide whether Ohio Adm.code 3745-21-07(G)(2) applies to a chemical distribution facility that is involved in the transfer, packaging, and shipping of photochemically reactive materials.

{¶ 6} Ohio Adm.code 3745-21-07(G)(2) regulates the discharge of photochemically reactive material into the atmosphere:

"(G) Operations using liquid organic material:

" * * *

"(2) A person shall not discharge more than forty pounds of organic material into the atmosphere in any one day, nor more than eight pounds in any one hour,

2

from any article, machine, equipment, or other contrivance used under conditions other than described in paragraph (G)(1) of this rule for *employing, applying, evaporating or drying any photochemically reactive material,* or substance containing such photochemically reactive material, unless said discharge has been reduced by at least eighty-five percent." (Emphasis added.)

**{¶ 7}** The parties have stipulated that appellant's facilities are not being used for "applying," "evaporating," or "drying" any photochemically reactive material, as set forth in the administrative rule. The only issue is whether appellant's facilities are "employing" any photochemically reactive material in its operations.

**{¶ 8}** The term "employing" is not defined in the Ohio Revised Code or the Ohio Administrative Code.[1] From the inception of this dispute, appellee has argued that the term "employing" should be interpreted to mean "using" in its broadest sense, and that Ohio Adm.Code 3745-21-07(G)(2) applies to the container-filling procedures at the Darrow Road facility, since appellant is "employing" or "using" the chemicals in its distribution process.

**{¶ 9}** ERAC, however, declined to adopt this broad definition of the term "employing." Instead, ERAC held that the term "employing" must be given a meaning narrower than "using," as argued by appellee.

**{¶ 10}** ERAC applied two rules of statutory construction in making this determination. It applied R.C. 1.42, which states, "Words and phrases shall be read *in context* and construed according to the rules of grammar and common usage."

---

1. A public information bulletin of the Ohio Environmental Protection Agency defines "employing" as "the use of photochemically reactive materials in any type of production equipment in normal, day-to-day work functions. It could also mean the use of photochemically reactive materials in any type of equipment that a company uses to form a final product or intermediate (by-product) that the company sells." Frequently Asked Questions on Title V and STARShip III (ftp://ftp.sconet.state.oh.us/Opinions/2001/001154att.pdf) See http://www.epa.state.oh.us/dapc/title_v/tvfaq3.html. Both parties contend that this guidance document supports their competing interpretations of the term "employing." However, we find that the document itself is ambiguous and does not squarely answer the question before us.

(Emphasis added.) ERAC also applied a related rule of statutory construction known as *noscitur a sociis*, "it is known from its associates." Under this doctrine, where the meaning of a word is unclear, a court will look at the surrounding words to ascertain the doubtful word's meaning. 2A Singer Sutherland, Statutory Construction (6 Ed. 2000), Section 47:16.

{¶ 11} Under these rules of statutory construction, ERAC looked at the words "applying," "evaporating," and "drying," which follow the term "employing."[2] ERAC concluded that the term "employing" "must not be construed to its widest extent and must take its meaning from the terms with which it is associated in paragraph (G)(2); that is 'applying, evaporating or drying.' "

{¶ 12} Furthermore, ERAC found that a narrow construction of the term "employing" was appropriate when subsection (G)(2) was read in context with the other subsections in the regulation. According to ERAC, "if the correct definition of 'employ' were simply 'to use,' then there would be no need for the other subsections of the regulation." ERAC also reasoned that even "[t]he title of subsection (G), 'Operations using organic material,' indicates that the subsequently described operations will be using organic material in some more specific way. To reassign the general definition of 'use' to 'employ' in paragraph (G)(2) would make the use of the term in the title redundant."

{¶ 13} The court of appeals found that the interpretation adopted by ERAC was unlawful and that ERAC erred in applying the doctrine of *noscitur a sociis*. The court reasoned that according to *State ex rel. Rear Door Bookstore v. Tenth Dist. Court of Appeals* (1992), 63 Ohio St.3d 354, 588 N.E.2d 116, *noscitur a sociis* should be used only where all the words listed together have analogous meaning. Since the words "employing," "applying," "evaporating," and drying" are not

---

2. ERAC stated that "applying" is defined "to mean 'to employ for a particular purpose' or to 'put on or adapt for a special use,' " whereas the terms "evaporating" and "drying" "refer to the change which occurs when a product is either converted into vapor leaving only the dry solid portion behind (evaporating) or becomes free from moisture (drying)."

analogous and each has its distinct meaning, the court said the maxim was inapplicable.

{¶ 14} Instead, the court of appeals focused on that portion of R.C. 1.42 that states that words shall be construed according to common usage. It then construed "employing" according to its common dictionary meaning, which is " 'to make use of; use * * * to put or bring into action or service; employ for or apply to a given purpose,' " quoting Webster's New World College Dictionary (2 Ed. 1972). The court of appeals found that the administrative rule applied, since appellant was using organic materials in its filling lines. Under its broad interpretation, the court also determined that paragraph (G)(2) of the rule acts as a catchall and covers those procedures not addressed in subsections (D) and (E), thereby ensuring that all operations using photochemically reactive materials are subject to regulation.

{¶ 15} Our job is to decide whether the court of appeals was correct in reversing the decision of ERAC. R.C. 3745.06 provides that the court of appeals must affirm an administrative decision issued by the Environmental Review Appeals Commission if that decision is supported by "reliable, probative, and substantial evidence and is in accordance with law."

{¶ 16} Regardless of whether the statutory language is construed pursuant to the doctrine of *noscitur a sociis* or R.C. 1.42, the result would be the same, since both rules of statutory construction require that words be read *in context*.

{¶ 17} In looking at the common usage of the term "employing," we find that even under the dictionary definition of the term "employing," as quoted by the court of appeals, "employing" is not defined solely to mean "to use." Instead, it is also defined as "to make use of; use * * * to put or bring into action or service; employ for or apply to a given purpose." Under this definition, appellant's facilities are not employing photochemically reactive chemicals, because its container-filling lines are not putting the chemicals into any type of action or service. Nor are the facilities applying the chemicals to a given purpose. Instead, the chemicals are

simply being transferred from one container to another for shipment and are not being used to form any final product.

{¶ 18} Moreover, considering the context, we believe that ERAC was correct in interpreting the term "employing" in narrow terms. If the correct interpretation of the term "employing" were simply "using," then the terms "applying," "evaporating," and "drying" as used in paragraph (G)(2) would become superfluous. For instance, as ERAC noted, the term "applying" is defined in the dictionary to mean "to employ for a particular purpose" or to "put on or adapt for a special use." If we were to accept the court of appeals' broad definition of "employing" to encompass virtually any use, then the term "applying" would be rendered meaningless. This could not have been the intent behind the regulation.

{¶ 19} Similarly, if we construe the term "employing" in its broadest sense, there would have been no need to include the other subsections within the regulation, which refer to specific processes. See, *e.g.*, Ohio Adm.Code 3745-21-07(G)(1), which limits the amount of discharge that can result from baking or heat-curing liquid organic material or substances containing liquid organic material.

{¶ 20} Moreover, subsections (D) and (E) regulate the storage and loading of photochemically reactive materials when they are placed, stored, or held in either large stationary containers (over five hundred gallons) or mobile containers such as tank trucks, trailers, and railroad tank cars. The regulations of subsection (D) (the storage and transfer of the organic chemicals) describe the processes at appellant's facility, except that the regulations apply only to operations over a certain threshold size (sixty-five thousand gallons). This, too, lends credence to the view that facilities such as appellant's were not intended to be subject to regulation. Thus, a more narrow interpretation of the term "employing," as found by ERAC, comports with this purpose.

**{¶ 21}** Furthermore, contrary to the court of appeals' opinion, there is simply no evidence that Ohio Adm.Code 3745-21-07(G)(2) was intended to serve as a catchall. The language used in the regulation does not justify this conclusion.

**{¶ 22}** In sum, when the term "employing" is interpreted according to its common usage and when read in context, it cannot be interpreted to mean "using" in the broadest sense. Because we find that ERAC's interpretation of Ohio Adm.code 3745-21-07(G)(2) was lawful and supported by reliable, probative, and substantial evidence, we hold that the court of appeals erred in reversing the decision of ERAC.

**{¶ 23}** Accordingly, we reverse the judgment of the court of appeals and reinstate the order issued by ERAC.

*Judgment reversed.*

MOYER, C.J., RESNICK, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

DOUGLAS, J., concurs in judgment.

————————————

*Porter, Wright, Morris & Arthur, L.L.P., Robert L. Brubaker* and *Katerina M. Eftimoff*, for appellant.

*Betty D. Montgomery*, Attorney General, *Bryan F. Zima, Douglas A. Curran* and *Laura J. Motes*, Assistant Attorneys General, for appellee.

*Brickler & Eckler, L.L.P., Kurtis A. Tunnell* and *Anne Marie Sferra*, urging reversal for *amicus curiae*, Ohio Manufacturers' Association.

*Porter, Wright, Morris & Arthur, L.L.P.,* and *Martin S. Seltzer*, urging reversal for *amicus curiae,* Ohio Chemistry Technology Council.

————————————