SUNOCO, INC. (R&M), APPELLANT, *v.* TOLEDO EDISON COMPANY ET AL.,
APPELLEES.

[Cite as *Sunoco, Inc. (R&M) v. Toledo Edison Co.,*
**129 Ohio St.3d 397, 2011-Ohio-2720.**]

*Public utilities — Special contracts and reasonable arrangements in electric-service contracts — Most-favored-nation clauses — Commission misconstrued the language of the clause — Order reversed.*

(No. 2009-0880 — Submitted February 15, 2011 — Decided June 9, 2011.)

APPEAL from the Public Utilities Commission, No. 07-1255-EL-CSS.

_____

**MCGEE BROWN, J.**

## Introduction

**{¶ 1}** Sunoco, Inc. (R&M) owns and operates petroleum-refining facilities in several states, including Oregon, Ohio. Sunoco purchases electric service for its Oregon facility from the Toledo Edison Company, intervening appellee.

**{¶ 2}** This case involves a contract between Sunoco and Toledo Edison for the sale of electricity. The contract is a "special contract," approved by appellee Public Utilities Commission of Ohio ("PUCO" or "commission") pursuant to R.C. 4905.31, which permits "reasonable arrangement[s]" between public utilities and their customers. Generally, such contracts include arrangements that differ from the standard rate schedules and are often tailored to a specific customer's service.

**{¶ 3}** The case also concerns a contract between BP Oil Company and Toledo Edison for the sale of electricity. BP owns and operates a competing refinery located adjacent to Sunoco's refinery. Both the Sunoco and BP contracts

contain clauses generally called "most favored nation" clauses. These clauses – titled "Comparable Facility Price Protection" – allow Sunoco and BP to utilize any "arrangement, rates or charges" for their facilities that Toledo Edison has given to the other.

{¶ 4} The sole issue in this case is whether Sunoco could invoke the most-favored-nation clause to extend the duration of its contract with Toledo Edison to match the duration of BP's contract with Toledo Edison. If the clause can be used to extend the contract, then Sunoco would pay the same rate that BP paid for electric service from February 2008 until December 31, 2008. If the contract is not extended, Sunoco would be obligated to pay Toledo Edison over $13 million in higher electric bills.

{¶ 5} The commission found that the plain language of the most-favored-nation clause did not allow Sunoco to extend the duration of its contract to match the duration of BP's contract. We find that the commission committed several errors in construing the language of the most-favored-nation clause. As a result, we reverse the decision of the commission and render judgment in favor of Sunoco.

**Facts**

{¶ 6} Sunoco, Inc. (R&M) filed a complaint in 2007 against Toledo Edison in the Public Utilities Commission of Ohio. In proceedings before the commission, the parties filed joint stipulations of facts, which include the following information.

{¶ 7} In 1996, Toledo Edison entered into an electric-service contract with Sunoco. Also in 1996, Toledo Edison entered into a similar contract with BP, hereinafter referred to as "the BP Agreement" or "the 1996 Agreement." The BP Agreement provided that it would remain in effect until June 2006.

{¶ 8} On May 17, 1999, Sunoco and Toledo Edison entered into an electric-service agreement (the "Sunoco Agreement" or "the 1999 Agreement"),

which replaced the 1996 Sunoco-Toledo Edison contract. The Sunoco Agreement is a special contract authorized by the PUCO pursuant to R.C. 4905.31. Under the terms of the special contract, Sunoco was entitled to pricing for electric service that was below standard tariff rates. The Sunoco Agreement provided that it would remain in effect through June 2006 – the same date as the BP Agreement.

{¶ 9} The Sunoco Agreement and the BP Agreement contained identical most-favored-nation clauses. Generally, Sunoco and BP could utilize the clause to obtain a benefit – in the form of an "arrangement, rates or charges" – that Toledo Edison had given the other. In each of these agreements, the clause was titled "Comparable Facility Price Protection." No one disputes that Sunoco and BP are comparable facilities as that term is defined in the most-favored-nation clause.

{¶ 10} In late 1999, the General Assembly enacted legislation that restructured Ohio's electric-utility industry to allow retail customers to buy electricity from someone other than their local electric company. See Am.Sub.S.B. No. 3, 148 Ohio Laws, Part IV, 7962. Codified as R.C. Chapter 4928, the legislation was commonly known as "S.B. 3." What followed was a series of cases at the PUCO involving Toledo Edison and other electric utilities in which the PUCO attempted to ease the transition from a regulated rate structure to a market-rate structure. See the electric-transition-plan ("ETP") case, *In re Application of Ohio Edison Co.* (July 19, 2000), PUCO No. 09-1212-EL-ETP; and the rate-stabilization-plan ("RSP") case, *In re Application of Ohio Edison Co.* (Oct. 28, 2003), PUCO No. 03-2144-EL-ATA, in which the PUCO allowed Toledo Edison and its large customers to extend the terms of their pre-S.B. 3 service contracts.

{¶ 11} The first extension was proposed through a joint stipulation filed by Toledo Edison and other parties to Toledo Edison's ETP case. The electric-transition-plan stipulation provided that each electric-service customer that had

entered into a special contract with Toledo Edison would be given a one-time opportunity to continue, cancel, or extend the terms of its special contracts, provided that those customers gave Toledo Edison timely notice. As was required by the electric-transition-plan stipulation and the commission's order approving that stipulation, Toledo Edison gave notice to each special-contract customer of the option to extend the duration of its contract. Sunoco elected to extend the terms of its 1999 Agreement with Toledo Edison. Likewise, BP elected to extend the terms of its 1996 Agreement with Toledo Edison.[1]

{¶ 12} The next opportunity to extend occurred in Toledo Edison's RSP case. In that case, the commission again approved a joint stipulation filed by Toledo Edison and other parties allowing Toledo Edison's customers to extend the term of any special contract "upon the request of the customer, or its agent, received within 30 days of the Commission's order in this case." However, unlike in the ETP case, the stipulation and the PUCO's order in the RSP case did not require Toledo Edison to notify its contract customers of the opportunity to extend, and Toledo Edison did not directly communicate with Sunoco, BP, or any other contract customer regarding this option. Nevertheless, within that 30-day window, BP requested that Toledo Edison extend the 1996 BP Agreement, which Toledo Edison agreed to do. Sunoco did not submit a request to Toledo Edison to extend the Sunoco Agreement.

{¶ 13} A final stipulated contract extension was approved in Toledo Edison's rate-certainty-plan ("RCP") case, *In re Application of Ohio Edison Co.*, PUCO No. 05-1125-EL-ETA, a case that is still open. The stipulation in the RCP case provided that the special contracts that were extended under the RSP case — such as the BP Agreement — would continue in effect until December 31, 2008. The stipulation further provided that special contracts extended under the ETP

---

1. The contract extensions were not for a specific date but depended instead upon the date that Toledo Edison could no longer collect regulatory transition charges.

case, but not extended under the RSP case – such as the Sunoco Agreement – would continue in effect only until February 2008. Thus, Sunoco's agreement was scheduled to expire ten months before BP's agreement.

{¶ 14} On or about May 16, 2007, Toledo Edison informed Sunoco that the Sunoco Agreement would terminate in February 2008.

{¶ 15} On November 13, 2007, Sunoco sent a letter to Toledo Edison stating that Sunoco "is exercising its right under the [Sunoco] Agreement to utilize the BP Oil Company arrangement including, in particular, the term of that arrangement which has been extended until December 31, 2008" and disputing Toledo Edison's right to terminate the Sunoco Agreement in February 2008. Sunoco invoked the most-favored-nation clause in its 1999 Agreement with Toledo Edison as evidence that the duration of Sunoco's agreement must match the duration of the BP Agreement.

{¶ 16} On November 16, 2007, Toledo Edison responded with a letter to Sunoco stating that it has "a different interpretation of the impact of the provision of the contract," disputing that Sunoco had the right to extend the term of the Sunoco Agreement until December 31, 2008.

{¶ 17} On December 6, 2007, Sunoco filed a complaint with the commission against Toledo Edison under R.C. 4905.26. Sunoco challenged Toledo Edison's refusal to extend the duration of the Sunoco Agreement to December 31, 2008. The complaint alleged that if the agreement was terminated in February 2008, as Toledo Edison intended, Sunoco's electric bills would be "millions of dollars higher," and Sunoco would "operate at a competitive disadvantage to the adjacent BP facility."

{¶ 18} On February 20, 2008, Sunoco agreed to pay into an escrow account the difference between what Sunoco and Toledo Edison alleged should be the cost of Sunoco's electric service between its February 2008 billing date and December 31, 2008.

{¶ 19} On February 19, 2009, the commission issued its order denying Sunoco's complaint. The commission found that the most-favored-nation clause was a price-protection provision that was limited in its application to rates and charges for electrical service. Accordingly, the commission held that Sunoco had not provided sufficient evidence to show that the most-favored-nation clause allowed Sunoco to extend the duration of its contract to December 31, 2008, to match the termination date of the BP agreement.

{¶ 20} Sunoco filed a timely application for rehearing. The commission denied Sunoco's application.

{¶ 21} Sunoco appealed to this court, raising four propositions of law. For the reasons discussed below, we sustain propositions of law Nos. 1, 3, and 4 and reverse the commission's order.

**Standard of Review**

{¶ 22} "R.C. 4903.13 provides that a PUCO order shall be reversed, vacated, or modified by this court only when, upon consideration of the record, the court finds the order to be unlawful or unreasonable." *Constellation NewEnergy, Inc. v. Pub. Util. Comm.*, 104 Ohio St.3d 530, 2004-Ohio-6767, 820 N.E.2d 885, ¶ 50. We will not " 'reverse or modify a PUCO decision as to questions of fact where the record contains sufficient probative evidence to show [that] the PUCO's determination is not manifestly against the weight of the evidence and is not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty.' " *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29, quoting *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.* (2000), 88 Ohio St.3d 549, 555, 728 N.E.2d 371. "[T]he appellant bears the burden of demonstrating that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record." Id.

**{¶ 23}** Although "we have complete and independent power of review as to all questions of law" in appeals from the PUCO, *Ohio Edison Co. v. Pub. Util. Comm.* (1997), 78 Ohio St.3d 466, 469, 678 N.E.2d 922, we have explained that we may rely on the expertise of a state agency in interpreting a law where "highly specialized issues" are involved and "where agency expertise would, therefore, be of assistance in discerning the presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 108, 110, 12 O.O.3d 115, 388 N.E.2d 1370.

### Analysis

#### A. Sunoco's Proposition of Law No. 1

**{¶ 24}** In its first proposition of law, Sunoco contends that the commission erred when it found that the plain language of the most-favored-nation clause in the Sunoco Agreement did not allow Sunoco to extend the duration of its contract to make it identical to the BP Agreement. We agree. The commission's interpretation of the most-favored-nation clause was unlawful and unreasonable for the following reasons.

1. The PUCO erred in considering the title of the clause

**{¶ 25}** Sunoco first contends that the PUCO wrongfully relied on the heading of the clause in interpreting the scope and intent of the clause. In its order, the commission noted that the most-favored-nation clause is titled "Comparable Facility Price Protection." The commission then stated that "[t]he first indication of the scope of the most favored nation clause is the title of the clause itself, which plainly indicates that the clause is intended to provide price protection between comparable facilities and is not intended to deal with the termination date of the contract." Sunoco maintains that the PUCO erred in this regard because the 1999 Sunoco Agreement prohibits using clause headings to interpret the scope and intent of any clause.

{¶ 26} Sunoco is correct. Section 10.6 of the Sunoco Agreement, titled "Clause Heading," provides, "The clause headings appearing in this Agreement have been inserted for the purpose of convenience and ready reference. They do not purport to and shall not be deemed to define, limit or extend the scope or intent of the clauses to which they pertain." Thus, the commission erred in relying on the clause heading.

{¶ 27} The PUCO and Toledo Edison both counter that Sunoco did not preserve this issue for appeal by raising it in its application for rehearing at the commission or in its notice of appeal to this court. See R.C. 4903.10 and 4903.13. We find that this issue is properly before us.

{¶ 28} Sunoco's rehearing application and notice of appeal both contained the following identical language: "The Order is unjust and unlawful in that it finds that the 'Comparable Facility Price Protection' (hereinafter 'MFN clause') of the 1999 Agreement * * * only allowed Sunoco to invoke the provision to obtain a price for power from Toledo Edison identical to that in the Agreement between BP Oil Company * * * and Toledo Edison, and did not allow it to invoke the MFN clause to extend the duration of the contract to make it identical to the BP Agreement." (Footnote omitted.) The commission found that the title of the most-favored-nation clause "plainly indicates that the clause is intended to provide price protection between comparable facilities and is not intended to deal with the termination date of the contract." Sunoco's rehearing application and notice of appeal specifically referred to the commission's finding that the title heading ("Comparable Facility Price Protection") was intended only to provide price protection between comparable facilities ("only allowed Sunoco to invoke the provision to obtain a price for power from Toledo Edison identical to that in the Agreement between BP Oil Company and Toledo Edison"). We conclude that this language was sufficient to preserve this issue for our review. See *Discount*

*Cellular, Inc. v. Pub. Util. Comm.*, 112 Ohio St.3d 360, 2007-Ohio-53, 859 N.E.2d 957, ¶ 59.

2. The PUCO misconstrued the plain language

of the most-favored-nation clause

**{¶ 29}** Section 9.2, the most-favored-nation clause in the 1999 Sunoco Agreement, provides:

**{¶ 30}** "If the Company provides an arrangement, rates or charges which is or may be in effect at any time during the term of this Agreement, to a Comparable Facility within its certified territory, then the Customer will have the right to utilize that arrangement, rates or charges for its Facility. The Customer must comply with all other terms and conditions of the arrangement including firm and interruptible load characteristics/conditions."

**{¶ 31}** The commission found that the plain language of this clause did not allow Sunoco's termination date in its 1999 Agreement with Toledo Edison to match the termination date of BP's 1996 Agreement with Toledo Edison. Specifically, the commission rejected Sunoco's "attempts to interpret the word 'arrangement,' as used in this provision, to infer a relationship with the duration of the contract." The commission reasoned that "within the context of the comparable facility price provision, the duration or 'term' of the contract is referred to separately from the 'terms and conditions of the arrangement.' Clearly, the language 'during the term of this agreement,' which is contained in the most favored nation clause, makes that clause applicable to provisions of the contract other than the duration of the contract. Thus, we can not [sic] find that the most favored nation clause enables Sunoco to adopt the duration or 'term' of BP's contract."

**{¶ 32}** Sunoco contends that the commission's interpretation is not supported by a plain reading of the most-favored-nation clause. We agree with Sunoco and find that the commission's interpretation – specifically its reading of

the first sentence of the most-favored-nation clause – is not a reasonable interpretation of the plain language of the clause.

{¶ 33} In construing the plain language of the clause, the commission based its finding solely on the fact that the duration or "*term* of this Agreement" – set forth in the first sentence of the most-favored-nation clause – is referred to separately from the "terms and conditions of the arrangement" in the second sentence of the clause. According to the commission, the phrase "during the term of this Agreement" made the most-favored-nation clause applicable to all other provisions of the contract except the contract's duration. The commission's reasoning appears to be that because these phrases are separated in the most-favored-nation clause and used in different contexts, Sunoco and Toledo Edison intended the words "arrangement" and "term" (meaning duration) to have different meanings. Presumably based on this reasoning, the commission concluded that the duration of the contract was outside the scope of an "arrangement."

{¶ 34} This was error. The first sentence of the most-favored-nation clause reads as follows: "If the Company provides an arrangement, rates or charges which is or may be in effect at any time during the term of this Agreement, to a Comparable Facility within its certified territory, then the Customer will have the right to utilize that arrangement, rates or charges for its Facility." This language is limiting, but not in the manner the commission found. The language of this provision, when construed in its proper context, merely means that Sunoco can invoke the most-favored-nation clause only "during the term of this Agreement." Stated another way, the first sentence limits Toledo Edison's obligations under the most-favored-nation clause to the "term of this Agreement," meaning that Sunoco has no right to invoke the clause after the agreement has expired. Because Sunoco invoked the clause before the contract

expired, the "during the term of this Agreement" provision is not at issue in this appeal.

### 3. The meaning of the word "arrangement"

{¶ 35} By focusing its attention on the phrases "during the term of this Agreement" and "terms and conditions of the arrangement," the commission overlooked the dispositive question in this case: the meaning of the word "arrangement." Section 9.2 of the most-favored-nation clause provides that "the Customer (here Sunoco) will have the right to utilize [any] arrangement, rates or charges for its Facility" that Toledo Edison provides to BP. Thus, the crux of the issue before us is whether the duration of the BP contract was an "arrangement" provided by Toledo Edison that Sunoco could utilize for its facility.

{¶ 36} Sunoco asserts that the word "arrangement" in the most-favored-nation clause allows Sunoco to utilize all terms and conditions of the BP Agreement for its facility, including contract duration. Sunoco's primary argument is that the word "arrangement" means the "entire contract" or "entire agreement."[2] We need not decide whether the parties intended that the word "arrangement" be interpreted to mean "entire contract or agreement." Rather, we need determine only whether "arrangement," as used in the most-favored-nation clause, encompasses the duration of a competitor's contract.

{¶ 37} When confronted with an issue of contract interpretation, our role is to give effect to the intent of the parties. We will examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract. In addition, we will look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement. When the language of a written contract is clear, a

---

2. In its reply brief, Sunoco argues for the first time that the word "arrangement," as set forth in G.C. 614-17, the predecessor to R.C. 4905.31, means "contract." See *Lake Erie Power & Light Co. v. Telling-Belle Vernon Co.* (1937), 57 Ohio App. 467, 11 O.O. 234, 14 N.E.2d 947, paragraph one of the syllabus. Sunoco is forbidden to raise new arguments in its reply brief. *State ex rel. Colvin v. Brunner,* 120 Ohio St.3d 110, 2008-Ohio-5041, 896 N.E.2d 979, ¶ 61.

court may look no further than the writing itself to find the intent of the parties. "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11.

{¶ 38} The most-favored-nation clause states that if Toledo Edison "provides an *arrangement*, rates or charges which is or may be in effect at any time during the term of this Agreement, to a Comparable Facility within its certified territory, then the Customer will have the right to utilize that *arrangement*, rates or charges for its Facility." (Emphasis added.) The word "arrangement" is not defined in the Sunoco Agreement. Common, undefined words appearing in a contract "will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents" of the agreement. *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph two of the syllabus.

{¶ 39} We then must look to the ordinary meaning of the word "arrangement." While there are several dictionary definitions of "arrangement," even the narrower definitions fit within the context of the most-favored-nation clause, such as "adjustment," "mutual agreement," and "understanding." Webster's Third New International Dictionary (1986) 120 (definitions 6(a) and (b)(1)). Each of these definitions would fit within the context of the clause and would not result in "manifest absurdity." By implication then, any adjustment, agreement, or understanding that Toledo Edison provides to a comparable facility within its certified territory is an arrangement that Sunoco has the right to utilize for its facility.

{¶ 40} Moreover, although the words "arrangement, rates or charges" are used together in the same phrase, it is apparent from the face of the clause that "arrangement" means something other than "rates or charges." Rates and charges

are clearly price terms of the contract. Thus, it is reasonable to construe "arrangement" to encompass other, nonprice terms of the contract. In sum, when the word "arrangement" is interpreted according to its common usage and in context, the most-favored-nation clause allows Sunoco to utilize all nonprice terms of a competitor's contract. Because contract duration is a nonprice term, an "arrangement" would include the duration of the contract.

{¶ 41} This interpretation is consistent with the purpose of the most-favored-nation clause. The parties agree that the purpose of the most-favored-nation clause is to "level the playing field" between two competitors served by the same electric utility so that neither Sunoco nor BP has a competitive advantage over the other. Sunoco and BP would not be on equal footing if BP could obtain discount pricing for the entire duration of its contract, but Sunoco – because it was denied its right to match BP's contract duration – could not obtain the same discount for the same length of time.

4. Counterarguments to Sunoco's Proposition of Law of No. 1

{¶ 42} Both Toledo Edison and the PUCO raise several counterarguments. None have merit.

*a. Toledo Edison's Counterarguments*

i. Interpreting "arrangement" to include duration does not

violate the doctrine of noscitur a sociis

{¶ 43} Toledo Edison argues that Sunoco's interpretation of the word "arrangement" in the most-favored-nation clause violates the maxim noscitur a sociis, "it is known from its associates." *Ashland Chem. Co. v. Jones* (2001), 92 Ohio St.3d 234, 236, 749 N.E.2d 744. Under the doctrine of noscitur a sociis, the meaning of an unclear word may be derived from the meaning of accompanying words. Id. at 236-237.

{¶ 44} Toledo Edison concedes that "arrangement" refers to nonprice terms of the contract, but it maintains that such nonprice terms include only

"*similar* non-price terms, such as the choice between interruptible and firm power that was so important to Sunoco." Yet Toledo Edison offers no compelling argument why "arrangement" must be construed so narrowly. Had Toledo Edison wanted the most-favored-nation clause to apply only to specific terms of the contract such as the type of power supplied, using a broad term like "arrangement" is an odd way to limit the reach of that clause. The word "arrangement," because of its breadth, would seemingly cover most, if not all, nonprice terms and provisions of a competitor's contract.

ii. *Eveleth* is not persuasive

{¶45} Toledo Edison asserts that several courts in other jurisdictions have reviewed similar most-favored-nation clauses in electric-utility-supply contracts and rejected the very arguments that Sunoco makes here. Toledo Edison states that the commission had the benefit of several of these court decisions, but Toledo Edison cites only one: *Eveleth Taconite Co. v. Minnesota Power & Light Co.* (1974), 301 Minn. 20, 221 N.W.2d 157.[3] *Eveleth*, however, is inapposite.

{¶ 46} First, *Eveleth* is distinguishable because the most-favored-nation clause in that case does not contain the language of the clause in this case. Specifically, the clause in *Eveleth* does not contain the word "arrangement." Thus, *Eveleth*'s interpretation of a similar most-favored-nation clause has no bearing on determining the meaning of the clause at issue here.

{¶ 47} Second, Toledo Edison's reliance on *Eveleth* is misplaced because the court went beyond the four corners of the contract and relied on extrinsic evidence of precontract negotiations between the customer and the utility to determine the intent of the parties. See *Eveleth*, 301 Minn. at 27. In contrast, extrinsic evidence cannot be considered in this case because the outcome turns

---

3. The commission cited *Eveleth* and reasoned that "within the context of the comparable facility price provision, the duration or 'term' of the contract is referred to separately from the 'terms and conditions of the arrangement.' " See *Eveleth*, 301 Minn. at 27-28, 221 N.W.2d 157.

solely on the plain language of the most-favored-nation clause. See *Shifrin v. Forest City Ents., Inc.* (1992), 64 Ohio St.3d 635, 597 N.E.2d 499, syllabus.

### iii. *Baker Car & Truck Rental* and *Waterloo Furniture* are distinguishable

{¶ 48} Toledo Edison also contends that courts in other jurisdictions "consistently have found that contracts with most favored nation clauses end on the termination date specified in the contract unless the contract itself contains specific language authorizing an extension of the contract's term." Toledo Edison refers the court to *Baker Car & Truck Rental, Inc. v. Little Rock* (1996), 325 Ark. 357, 925 S.W.2d 780, and *Waterloo Furniture Components, Ltd. v. Haworth, Inc.* (C.A.7, 2006), 467 F.3d 641.

{¶ 49} Both *Baker Car* and *Waterloo Furniture* turned on the fact that neither plaintiff had attempted to invoke the most-favored-nation clauses of its contract until *after* the contract had already expired. See *Baker Car,* 325 Ark. at 359, 363; *Waterloo Furniture*, 467 F.3d at 645-646. In contrast to this case, there is no dispute that Sunoco invoked the most-favored-nation clause *before* its 1999 contract with Toledo Edison had expired. As a result, we reject Toledo Edison's invitation to rely on these cases as persuasive authority.

### b. The Commission's Counterarguments

#### i. The PUCO's fear of perpetual contracts is unwarranted

{¶ 50} The PUCO first counters that if Sunoco's interpretation of the most-favored-nation clause prevails, the consequences would be "unintended and irrational." Specifically, the PUCO claims that Sunoco would be able to extend its contract with Toledo Edison indefinitely should Toledo Edison continue to enter into special contracts with other oil refineries' operating facilities comparable to Sunoco's facility. The PUCO's argument is speculative and without merit.

{¶ 51} There is no evidence in the record of any other special contracts involving Toledo Edison and BP, or any other oil refinery for that matter. Indeed,

the record is silent as to whether refineries beyond those operated by Sunoco and BP even exist in Toledo Edison's service territory. This case concerns only the 1999 Sunoco Agreement and Sunoco's request to extend that agreement to match the expiration date of the 1996 BP Agreement. Based on the stipulated facts of this case, BP's contract expired on December 31, 2008. Thus, the Sunoco Agreement will be extended to December 31, 2008, and no further.

### ii. Requirements set forth in the RSP case are not "terms and conditions of the arrangement" under the most-favored-nation clause

{¶ 52} The most-favored-nation clause provides that for a customer to utilize an "arrangement," that customer "must comply with all other terms and conditions of the arrangement including firm and interruptible load characteristics/conditions." The PUCO states that assuming that an "arrangement" encompasses a contract extension, the arrangement allowing BP to extend its contract to December 31, 2008, was made pursuant to the RSP case. The PUCO notes that the stipulation in that case offered all of Toledo Edison's special-contract customers — including BP and Sunoco — a one-time opportunity to extend their agreements, provided that they notify Toledo Edison of their decision to extend their contracts within 30 days of the commission's order approving the stipulation. The PUCO maintains that Sunoco was offered the same arrangement as BP; BP complied with the notification requirement, but Sunoco did not. According to the PUCO, Sunoco cannot utilize the arrangement offered to BP because Sunoco failed to comply with the terms and conditions of the arrangement.

{¶ 53} What the PUCO overlooks here is that if Sunoco had accepted Toledo Edison's offer in the RSP case, there would be no need to resort to the most-favored-nation clause as a means of extending its contract with Toledo Edison. Acceptance of the offer, by itself, would have extended the Sunoco Agreement through December 2008. The whole aim of the most-favored-nation

clause is to allow its beneficiary to avail itself of a contractual arrangement based merely on the fact that another Toledo Edison customer enjoys that arrangement. That aim is defeated if "*terms and conditions* of the arrangement" includes a prerequisite that precludes Sunoco from invoking the clause in the first place.

{¶ 54} In interpreting a contract, we are required, if possible, to give effect to every provision of the contract. " '[I]f one construction of a doubtful condition written in a contract' " would render a clause meaningless and it is possible that another construction would give that same clause meaning and purpose, then the latter construction must prevail. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1997), 78 Ohio St.3d 353, 362, 678 N.E.2d 519, quoting *Farmers Natl. Bank v. Delaware Ins. Co.* (1911), 83 Ohio St. 309, 94 N.E. 834, paragraph six of the syllabus. We find that the notice requirement of the RSP stipulation is not a term or condition of an "arrangement." Simply stated, the PUCO's construction here would render the phrase "all other terms and conditions of the arrangement" a nullity and defeat the purpose of the most-favored-nation clause.

5. Conclusion to Proposition of Law No. 1

{¶ 55} Sunoco's first proposition of law is well taken. The most-favored-nation clause is not strictly a price-protection provision. Instead, the clause allows Sunoco to utilize any more favorable "arrangement, rates or charges" that Toledo Edison offers to a competitor of Sunoco. Under the plain language of the clause, the word "arrangement" encompasses all nonprice terms of a competitor's contract. Duration is a nonprice term of a contract and, consequently, is subject to the clause. Moreover, this interpretation is consistent with the agreed purpose of the clause, which is to ensure that neither Sunoco nor BP obtains a competitive advantage over the other. Toledo Edison's refusal to allow Sunoco to invoke the clause to extend its contract to match BP's contract placed Sunoco at a competitive disadvantage. Therefore, we hold that the most-favored-nation clause

allows Sunoco to extend the termination date of its 1999 Agreement to match the termination date of the 1996 BP Agreement.

### B. Sunoco's Propositions of Law Nos. 3 and 4

{¶ 56} In proposition of law No. 3, Sunoco faults the commission for relying on "equitable considerations" and other factors that were outside the plain language of the contract in ruling against Sunoco in this case. In proposition of law No. 4, Sunoco asserts that the commission erred when it found that Sunoco was attempting to "collaterally attack" the commission's decisions in the RSP and RCP cases.

{¶ 57} Sunoco's third and fourth propositions of law are well taken for the following reasons.

### 1. The commission's reliance on extrinsic evidence was unlawful

{¶ 58} First, Sunoco claims that the commission's order is unlawful because it found that Sunoco, as "a sophisticated energy consumer," should have extended its contract in the RSP case, just as BP did. Because the commission found that the plain language of the most-favored-nation clause was dispositive in resolving the issues before it, we find that it was unlawful for the commission to rely on matters outside the written agreement of the parties. See *Shifrin v. Forest City Ents., Inc.*, 64 Ohio St.3d 635, 597 N.E.2d 499, syllabus.

{¶ 59} Second, even if extrinsic evidence could be considered in this case, relying on this specific evidence was unreasonable and unlawful. Any discussion about what Sunoco did or did not do in the S.B. 3 cases is irrelevant to determining the intent of Sunoco and Toledo Edison in this case, because the Sunoco Agreement was executed on May 17, 1999, *before* S.B. 3 was enacted. When circumstances surrounding the agreement invest the language of the contract with a special meaning, extrinsic evidence can be considered in an effort to give effect to the parties' intention. *Shifrin*, 64 Ohio St.3d 635, syllabus. But here, the commission relied on circumstances occurring after the parties had

formed their contract in 1999. This was error. The commission should not have relied on the S.B. 3 cases as a basis for denying Sunoco's complaint when there was no evidence in the record that the parties had contemplated the effects of electric deregulation when the contract was formed.

2. Sunoco did not collaterally attack the PUCO's prior orders

**{¶ 60}** The commission also found that Sunoco's complaint was a "collateral[ ] attack [on the commission's] decisions" in the RSP and RCP cases, and that to allow this attack to occur "at this late date" could provide "Sunoco with an unfair advantage over BP which apparently followed the cases and took the risk to extend its contract at a time when today's market rates were not known to them."

**{¶ 61}** The commission's references to "collateral[] attacks" and "this late date" misrepresent the record in this case. The Sunoco Agreement was set to expire in February 2008. On November 13, 2007, Sunoco attempted to invoke the most-favored-nation clause to extend its contract. When Toledo Edison rejected Sunoco's attempts to invoke the clause, Sunoco filed a complaint with the commission on December 5, 2007, to enforce its rights under the contract. Sunoco's complaint before the commission was grounded solely on its rights under the most-favored-nation clause of its contract with Toledo Edison. Sunoco referred to the RSP and RCP cases in its complaint only as the means by which BP was able to have its agreement with Toledo Edison extended. Rather than attacking these cases, Sunoco relied on these cases to show how BP was able to extend the duration of its contract. In sum, no evidence exists in the record to support the finding that Sunoco sat on its rights in order to obtain an unfair advantage over BP. See *MCI Telecommunications Corp. v. Pub. Util. Comm.* (1987), 32 Ohio St.3d 306, 312, 513 N.E.2d 337 (PUCO order may be reversed when the commission made "summary rulings and conclusions without developing the supporting rationale or record").

**{¶ 62}** Moreover, even if Sunoco did gain an "unfair advantage over BP" based on when it invoked the most-favored-nation clause, the commission erred in rejecting Sunoco's complaint on that basis. See *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 54-55, 544 N.E.2d 920 (when the terms of a contract are plain and unambiguous, a contract cannot be given a meaning different from the one reflected by its plain language in order to provide a more equitable result). Because the commission had previously found that the contract was plain and unambiguous, the commission was bound to give effect to the contract's express terms and was prohibited from rewriting the contract to remedy any unfairness to BP.

**{¶ 63}** Toledo Edison counters that the commission had the authority under R.C. 4905.31 to determine that Sunoco was making an untimely "collateral attack" on the decisions in the RSP and RCP cases that, if allowed, would disadvantage BP in the current competitive electric market.

**{¶ 64}** There is no dispute that the commission has authority under R.C. 4905.31 to regulate, supervise, and modify special contracts. But how far the commission's authority under this statute extends need not be decided here, because nowhere in the commission's orders in this case did the commission claim to be using its authority under R.C. 4905.31. R.C. 4903.09 requires the PUCO in all cases to file "findings of fact and written opinions setting forth the reasons prompting the decisions arrived at, based upon said findings of fact." We cannot find that the commission properly exercised its authority under R.C. 4905.31 when the commission never relied upon that statute in making its decision in this case.

### C. Sunoco's Proposition of Law No. 2

**{¶ 65}** In its second proposition of law, Sunoco maintains that the commission erred when it refused to consider the history of the contractual relationship between Sunoco and Toledo Edison in interpreting the Sunoco

Agreement. Sunoco also claims that the commission erred when it failed to consider certain internal memoranda of David Blank, the manager of the Rate Department for Toledo Edison's parent corporation, FirstEnergy.

{¶ 66} The commission did not err in declining to consider this evidence. As discussed in the preceding sections, extrinsic evidence cannot be considered to give effect to the contracting parties' intentions when the language of the contract is clear and unambiguous. *Shifrin*, 64 Ohio St.3d 635, 597 N.E.2d 499, syllabus.

## Conclusion

{¶ 67} We find Sunoco's first, third, and fourth propositions of law are well taken. Therefore, we reverse the order of the commission on those issues and enter judgment in favor of Sunoco. Sunoco's second proposition of law is overruled.

Order reversed.

O'CONNOR, C.J., and PFEIFER and LUNDBERG STRATTON, JJ., concur.

O'DONNELL, LANZINGER, and CUPP, JJ., dissent.

_____

**LANZINGER, J., dissenting.**

{¶ 68} BP Oil Company, a competitor of Sunoco, Inc. (R&M), took advantage of a contract extension with Toledo Edison Company. Although Sunoco had the same opportunity to do so, it did not seek an extension. Nevertheless, the majority holds that the most-favored-nation clause within Sunoco's contract guarantees Sunoco the benefit of BP's extended term. In part, the majority justifies its holding as enforcing the intent of the parties. Although Sunoco asserts that this result was intended, Toledo Edison vigorously disputes it and contends that Sunoco is not entitled to extend the duration of its contract to match BP's because the contract duration is not included within the meaning of "arrangement." I agree and therefore dissent.

**{¶ 69}** The contract between Sunoco and Toledo Edison is an electric-service agreement ("ESA") approved by the Public Utilities Commission of Ohio ("PUCO" or "commission") under R.C. 4905.31. This statute authorizes the PUCO to supervise a special discounted arrangement between an electric utility and one of its customers. "Every such *schedule or reasonable arrangement* shall be under the supervision and regulation of the commission, and is subject to change, alteration, or modification by the commission." (Emphasis added.) R.C. 4905.31(E). As part of its regulatory authority, the commission approved a stipulation that special contracts extended under the electric-transition-plan case (*In re Application of Ohio Edison Co.* (July 19, 2000), PUCO No. 09-1212-EL-ETP) but not extended under the rate-stabilization-plan case *(In re Application of Ohio Edison Co.* (Oct. 28, 2003), PUCO No. 03-2144-EL-ATA) would continue only until February 2008. *In re Application of Ohio Edison Co.*, PUCO No. 05-1125-EL-ETA. The commission held that the most-favored-nation clause did not entitle Sunoco to the ten-month extension that BP had negotiated with Toledo Edison.

**{¶ 70}** Sunoco bears a heavy burden in challenging PUCO orders by showing "that the commission's decision is against the manifest weight of the evidence or is clearly unsupported by the record." *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, ¶ 29, citing *AT&T Communications of Ohio, Inc. v. Pub. Util. Comm.* (2000), 88 Ohio St.3d 549, 555, 728 N.E.2d 371.

**{¶ 71}** The majority opinion contends that in determining the end date of Sunoco's ESA, the PUCO (1) improperly relied on the title of the most-favored-nation clause,(2) misread the first sentence of the disputed clause, and (3) erred in finding that the word "arrangement" does not include the duration of the contract. Although the commission's position differs from the majority's view, the PUCO orders are neither unsupported by evidence in the record nor against the manifest

weight of the evidence. I would uphold them against the three points discussed by the majority as well because of court holdings in other jurisdictions.

### Reference to Heading of Contract Clause

{¶ 72} I would hold that Sunoco waived the argument that the commission improperly relied on the title of the disputed clause by failing to include this point in its application for rehearing and in its notice of appeal. Nevertheless, even if Sunoco is held not to have waived the point, the commission's reference is supportable. Section 10.6 of Sunoco's ESA explains that clause headings are "for the purpose of convenience and ready reference" and "shall not be deemed to define, limit or extend the scope or intent of the clauses to which they pertain."

{¶ 73} The commission in its order does refer at several places to the ESA section titled "Comparable Facility Price Protection," and the majority makes much of the commission's use of the phrase " price protection provision." But both parties also use the words "most-favored-nation clause" in referring to and in discussing the meaning of Section 9, although neither phrase is found within the disputed section, which reads in full:

{¶ 74} "9.1 A Comparable Facility shall be defined as an operating oil refinery and located within the certified service territory of the Toledo Edison Company, as such service territory is defined on January 1, 1996.

{¶ 75} "9.2 If the Company provides an arrangement, rates or charges which is or may be in effect at any time during the term of this Agreement, to a Comparable Facility within its certified territory, then the Customer will have the right to utilize that arrangement, rates or charges for its Facility. The Customer must comply with all other terms and conditions of the arrangement including firm and interruptible load characteristics/conditions."

{¶ 76} The commission determined that this section did not specifically discuss the duration of the contract. Nothing mentions the length of time that the

contract is in effect. Section 9 of Sunoco's ESA does refer to "an arrangement, rates or charges," which, if offered to a comparable facility, will be available to the customer. Section 9.1 defines a comparable facility, and Section 9.2 offers a "right to utilize" a similar arrangement, i.e., provides price protection between comparable facilities during the term of the ESA. As the commission correctly noted, neither paragraph of Section 9 deals with the termination date of the ESA. The title "Comparable Facility Price Protection" for this clause simply describes the language of this "most-favored-nation clause," and the title does not limit or extend its scope or intent.

### Reading of First Sentence of Clause

{¶ 77} The second alleged error relates to the commission's reading of the first sentence of Section 9.2. "If the Company provides an arrangement, rates or charges which is or may be in effect at any time during the term of this Agreement, to a Comparable Facility within its certified territory, then the Customer will have the right to utilize that arrangement, rates or charges for its Facility." Instead of seeing this sentence as guaranteeing a customer an opportunity to obtain treatment similar to that of a comparable facility during the ESA's term, the majority states that it "merely means that Sunoco can invoke the most-favored-nation clause only 'during the term of this Agreement.' Stated another way, the first sentence limits Toledo Edison's obligations under the most-favored-nation clause to the 'term of this Agreement,' meaning that Sunoco has no right to invoke the clause after the agreement has expired." This seems to me to rewrite the language.

{¶ 78} More importantly, the commission has been reasonable in observing that the duration or "term" of the contract is referred to separately in Sunoco's ESA from the "terms and conditions of the arrangement." The distinction is also seen in the second sentence of Section 9.2, which gives the customer a reciprocal obligation: "The Customer must comply with *all other*

*terms and conditions of the arrangement* including firm and interruptible load characteristics/conditions." (Emphasis added.)

{¶ 79} Thus, if the company provides an "arrangement, rates or charges" while the agreement is in effect, i.e., at any time during the term, to a comparable facility (a competitor of the customer), the customer will then have the right to utilize that arrangement, rates or charges for its own facility. There is no need to reword the clause—an arrangement that benefits the competitor within the meaning of this section gives the customer the opportunity to make the same arrangement.

### The Meaning of "Arrangement"

{¶ 80} The majority interprets the term "arrangement" through a complicated method while ignoring a fundamental point. Although the word "arrangement" is undefined within the contract, the term has a specific meaning set forth in R.C. 4905.31. R.C. 4905.31, which governs an ESA, states that a public utility is not prohibited from "filing a *schedule* or establishing or entering into *any reasonable arrangement with* another public utility or with one or more of *its customers*, consumers, or employees* * *providing for any of the following*:

{¶ 81} "(A) The division or distribution of its surplus profits;

{¶ 82} "(B) A sliding scale of charges, including variations in rates based upon stipulated variations in cost as provided in the schedule or arrangement[;]

{¶ 83} "(C) A minimum charge for service to be rendered unless such minimum charge is made or prohibited by the terms of the franchise, grant, or ordinance under which such public utility is operated;

{¶ 84} "(D) A classification of service based upon the quantity used, the time when used, the purpose for which used, the duration of use, and any other reasonable consideration;

**{¶ 85}** "(E) Any other financial device that may be practicable or advantageous to the parties interested.*"* (Emphasis added.)

**{¶ 86}** Significantly the term "arrangement" does *not* include duration of the contract or the contract term. The statute establishes the obligation of the utility to file the "schedule or arrangement" with the PUCO, and the section concludes, " Every such *schedule or reasonable arrangement* shall be under the supervision and regulation of the commission, and is subject to change, alteration, or modification by the commission." (Emphasis added.) The ESA thus relates to special pricing, and "arrangement" refers to the types of "financial devices" that are listed in R.C. 4905.31.

### *Other Jurisdictions*

**{¶ 87}** Courts "consistently have found that contracts with most favored nation clauses end on the termination date specified in the contract unless the contract itself contains specific language authorizing an extension of the contract's term." Majority opinion at ¶ 48. See *Baker Car & Truck Rental, Inc. v. Little Rock* (1996), 325 Ark. 357, 362, 925 S.W.2d 780. See also *Waterloo Furniture Components, Ltd. v. Haworth, Inc.* (C.A.7, 2006)*,* 467 F.3d 641, 646 (a most-favored-nation clause "only provides insight into the parties [sic] obligations during the term of the contract. It does not extend the Agreement past its express termination date"). The fact that the contracts in these cases were attempted to be extended after their expiration, while Sunoco tried to extend the express termination date before the ESA expired, is not significant—the point is that the most-favored-nation clause does not function to extend the ESA's duration unless authority to do so exists within the contract.

**{¶ 88}** As an example of the type of extension authority expressed within a contract, the most-favored-nation clause at issue in *Saikhon, Inc. v. United Farm Workers of Am., AFL-CIO* (1980), 104 Cal.App.3d 1, 163 Cal.Rptr. 488, 489, specifically authorized a contracting party to extend its contract to a "termination

date" negotiated by the union with another produce company "during the term" of the agreement. This type of language is noticeably absent from Sunoco's ESA.

{¶ 89} The Minnesota Supreme Court held that a purchaser of electricity could not, under the most-favored-nation clause, extend the duration of its contract based upon the electric utility's contract with another customer. *Eveleth Taconite Co. v. Minnesota Power & Light Co.* (1974), 301 Minn. 20, 221 N.W.2d 157. The court stated that the phrase "terms or conditions," as used in the most-favored-nation clause, "was intended by the parties to mean the covenants and provisions" of the agreement "other than its duration and that the word 'term' * * * has a distinct meaning signifying the period of duration of the contract during which more favorable terms and conditions could, upon the election of plaintiff, be substituted into the agreement." *Id.* at syllabus. *Eveleth* relied upon a Colorado decision that also distinguished a contract's "term" or duration from the contract's "terms," which are the " 'conditions, limitations and propositions which comprise and govern the acts which the contracting parties agree expressly or impliedly to do or not to do.' " *Id.* at 161, quoting *Hurd v. Whitsett* (1878), 4 Colo. 77, 84. As *Eveleth* explained, the use of two separate phrases in the most-favored-nation clause, that is, "term" and "terms or conditions" in different parts of the clause and in different contexts, was further evidence that the parties had intended those words to have different meanings. *Id.* Although the majority attempts to distinguish *Eveleth* on the ground that it uses the phrase "arrangement, rates and changes" in place of "terms or conditions," this is a distinction without a difference. There is no authority within the ESA for Sunoco to extend its own contract term simply because BP took advantage of an opportunity to lengthen its ESA with Toledo Edison.

### Conclusion

{¶ 90} I cannot agree with the majority opinion that a most-favored-nation clause is a tool for extending a contract term beyond its termination date. Nothing

in Sunoco's ESA gives it that authority. Section 8 language relates to the "term and effective date" of the contract, while Section 9 includes the "arrangements, rates and charges" that are to be offered to a competitor during a contract term. Had Sunoco wished to obtain a longer ESA, it could have negotiated such an agreement by including specific language authorizing a longer or extended term, or it could have opted to extend its contract duration in the summer of 2004 as authorized by the commission's RSP order. Because it did neither, the commission did not err in denying Sunoco the relief it requested.

{¶ 91} I respectfully dissent and would hold that the PUCO acted reasonably in determining that Sunoco's contract ended in February, rather than December, 2008. I would affirm the PUCO orders in all respects.

_____

**CUPP, J., dissenting.**

{¶ 92} I remain unconvinced that the term "arrangement," as used in the Sunoco, Inc. (R & M) – Toledo Edison Company electric-service agreement, includes within its meaning the duration of the contract such that Sunoco may utilize the longer duration of the BP Oil Company – Toledo Edison contract to extend the duration of its own special contract over the objection of Toledo Edison.

{¶ 93} The language employed in the Sunoco-Toledo Edison special contract uses the terminology "arrangement, rates or charges" to describe what provisions in Toledo Edison special contracts with other customers Sunoco may take advantage of.

{¶ 94} R.C. 4905.31, which permits such special contracts between public utilities and their customers upon approval of the Public Utilities Commission of Ohio ("PUCO"), includes an illustrative list of such "arrangement[s]." None of them involve the duration of a special contract. Rather, it is clear that they involve conditions of service, as well as rates and charges. Because the Sunoco-

Toledo Edison contract already separately uses the terminology "rates and charges," it is reasonable to conclude that the plain meaning of the word "arrangement," as used in the special Sunoco-Toledo Edison contract, necessarily means something akin to conditions of service and similar matters.

{¶ 95} Moreover, the PUCO, which must approve these special contracts, has also construed the term "arrangement" to mean something other than duration of the contract. Because of the oversight that the statute grants the PUCO over these contracts, and because the PUCO must approve the special contracts before they can become effective, it is evident that the PUCO has special expertise in this matter. I would defer to the PUCO's determination, in which it has used its special expertise, that the term "arrangement" does not include the duration of the special contract such that Sunoco may extend the length of its own contract with Toledo Edison based upon the length of BP's special contract with Toledo Edison.

{¶ 96} Therefore, I respectfully dissent.

O'DONNELL, J., concurs in the foregoing opinion.

_____

Boehm, Kurtz & Lowry and David F. Boehm, for appellant.

Michael DeWine, Attorney General, and John H. Jones, William L. Wright, and Thomas W. McNamee, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

Calfee, Halter & Griswold, James F. Lang, and N. Trevor Alexander; and Mark A. Hayden, for intervening appellee Toledo Edison Company.

_____