[Cite as *Texlo, L.L.C. v. Gator Hillcrest Partners, L.L.L.P.*, 2024-Ohio-5686.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

TEXLO, LLC,

    Plaintiff-Appellee,

  vs.

GATOR HILLCREST PARTNERS, LLLP,

    Defendant-Appellant.

:
:
:
:
:
:
:

APPEAL NO.  C-240090
TRIAL NO.    A-2200514

*O P I N I O N*

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: December 6, 2024

*Bricker Graydon LLP* and *Susan M. Argo*, for Plaintiff-Appellee Texlo, LLC,

*Oana Johnson* and *Paul Croushore*, for Defendant-Appellant Gator Hillcrest Partners, LLLP.

**BERGERON, Presiding Judge.**

{¶1}  More than a decade into a commercial lease, the grocery store tenant brought suit against its landlord due to its alleged damage to the tenant's property—a cart theft deterrence system.  While the contractual language did not explicitly allocate ownership rights of the system to the tenant, the tenant believed that it owned the system by virtue of a provision that allowed it to install such a system, or alternatively, by way of a subsequent bill of sale.  After the trial court denied several pretrial motions, the case proceeded to a bench trial, and the trial court ultimately found in the tenant's favor, holding that the tenant owned the system, thereby requiring the landlord to pay for the resultant damage.  The landlord now appeals to this court, insisting that the tenant did not own the system under either theory.  After reviewing the contractual language and the record, we agree with the landlord and reverse the trial court's judgment.

I.

{¶2}  In February 2011, defendant-appellant Gator Hillcrest Partners, LLLP, ("Gator") and plaintiff-appellee Texlo, LLC, ("Texlo") entered into a commercial lease agreement wherein Gator leased its property on Seymour Avenue to Texlo for the operation of a grocery store, which sits within a larger shopping center.  Among other provisions in the agreement, a clause provides Texlo the right to install its own cart theft deterrent system (hereinafter "gatekeeper system").  Grocery stores struggle to ensure that people do not abscond with their carts, and the gatekeeper system seeks to prevent the carts from leaving the premises.

{¶3}  But it turned out that a previous tenant had already installed a gatekeeper system wire, and the system functioned well enough that Texlo decided to keep using it.  The way the system works, if anyone tries to take a shopping cart beyond

the wire's threshold, the wheels of the cart would lock, prohibiting the cart from going any further. The gatekeeper system consisted of a wire that ran underground, a transmitter inside the store (which acted similarly to a control panel), and a device that would unlock the wheels of the carts that were improperly taken beyond the wire's perimeter.

{¶4} The parties worked together for several years, amending their agreement several times as needed. But their relationship deteriorated in 2021, when Gator began some renovation projects on the property. It hired a contractor to repave the shopping center's parking lot, including the area surrounding Texlo's grocery store. Knowing that this might cause some inconveniences to the businesses in the shopping center, Gator communicated to Texlo (and other tenants) about these projects and that there would likely be portions of time where certain parts of the parking lot or certain entrances might be inaccessible. This renovation prompted yet another amendment to the parties' agreement, including provisions that Texlo acknowledged the prospect of periodic interferences with its use of the property and waived any claims related to such. Little did the parties know, this repavement project would be the catalyst for a years-long dispute.

{¶5} As the contractor paved the parking lot, it severed the wire to the gatekeeper system, rendering it entirely inoperable. Because this mistake would cost upwards of $10,000 to repair and could result in dozens of stolen shopping carts, Texlo informed Gator of the mishap, assuming it would offer to replace the gatekeeper system. Texlo, after all, believed it owned the system based on Sections 6.14 of the original lease agreement and a bill of sale that the parties executed in 2018. Section 6.14 provides:

Lessee shall have the right, at Lessee's sole cost and expense, (a) *to*

***install*** a cart theft deterrence system in a place in the Common Facilities in the location designated on <u>Exhibit A</u> . . . Lessee shall complete any and all work necessary ***to install*** the cart theft deterrence system in a good and workmanlike manner, in accordance with all applicable governmental codes, ordinances and regulations, and without unreasonably interfering with the use and operation of the Shopping Center. Lessee shall not be required to, but may, remove the system at any time before or within ten (10) days following the termination of this Lease by lapse of time or otherwise, provided Lessee shall repair any damage caused by such removal. If the cart theft deterrence system remains in the Shopping Center ten (10) days following the termination of this Lease by lapse of time or otherwise, such system shall be deemed part of the Shopping Center and shall be surrendered with the Leased Premises by Lessee.

(Emphasis added.)

**{¶6}** Alternatively, the bill of sale specified that Gator transferred "all of [its] right[s], title and interest, if any, in and to all equipment and personal property existing in the building . . . including, but not limited to, the equipment listed on Exhibit A." Exhibit A was identical to Exhibit G of the original lease agreement, chronicling an extensive list of equipment within the store. However, Exhibit G did *not* specifically list the gatekeeper system or any of its components, but Texlo argues that this bill of sale transferred ownership of all the equipment inside the building in 2018, including the gatekeeper system's transmitter.

**{¶7}** Unfortunately for Texlo, Gator did not see things the same way. Gator was initially hesitant to pay for the damage to the system even though it (incorrectly)

4

assumed that Texlo actually installed the wire. Texlo sent Gator a flurry of emails attempting to get it to pay for the damage to the system, but Gator demurred.

{¶8} Frustrated by the stalemate, Texlo eventually filed suit against Gator, claiming that Gator breached the parties' agreement when it refused to pay for the damage done to Texlo's property (the gatekeeper system). After Texlo filed suit, Gator learned that its assumptions were wrong and that Texlo actually used the previous tenant's wire. After lengthy litigation, both parties filed competing motions for summary judgment, which the trial court ultimately denied, finding factual issues in dispute as it pertained to the gatekeeper system's ownership. Namely, the trial court held that a genuine a factual dispute existed as to *who* owned it, and whether the ownership was transferred to Texlo at any point.

{¶9} The case proceeded to a bench trial, and representatives of both parties testified as to their understanding of the language in the agreement. Texlo representatives emphasized that they had used and made occasional repairs to the gatekeeper system for ten years with Gator's knowledge, which led them to believe that Gator also understood that Texlo owned it. However, a Gator representative testified that Gator was under the impression that Texlo had actually installed the gatekeeper system's wire itself, which provided the faulty foundation for its assumption. The trial court ultimately held that Texlo's continuous use of and occasional repairs to the system for ten years amounted to an "installation" under Section 6.14. On an alternate basis, the trial court also held that the bill of sale transferred ownership of equipment in the building (which was where the gatekeeper transmitter was at the time of execution), and the bill of sale also included shopping carts that were used with the system. The trial court then assessed Gator $23,516.94 for the damages to the gatekeeper system.

**{¶10}** Gator now appeals the trial court's judgment to this court, asserting four assignments of error. Gator argues that the trial court erred in denying its motion for a judgment on the pleadings, that it erred in finding that Texlo owned the gatekeeper system under either Section 6.14 or the bill of sale, that it erred in not dismissing the complaint or finding in Gator's favor pursuant to the various waiver provisions and a casualty clause in the amended and original agreements, and that it erred in awarding damages. After a review of the record, we agree with Gator that the trial court erred when it held that Texlo owned the gatekeeper system and was therefore entitled to damages after Gator's contractor severed the wire.

II.

**{¶11}** The real dispute in this case lies within Gator's second assignment of error, in which Gator argues that the trial court erred when it found that Texlo owned the gatekeeper system pursuant to the parties' agreement, entitling it to damages. In determining whether the trial court erred in this conclusion, we review the issue solely as a matter of contract interpretation, because the contractual language conclusively determines the ownership question.

**{¶12}** Contract interpretation presents a question of law that we review de novo. *Qiming He v. Half Price Heating & Air*, 2021-Ohio-1599, ¶ 6 (1st Dist.), citing *Hyde Park Circle, L.L.C. v. Cincinnati*, 2016-Ohio-3130, ¶ 15 (1st Dist.). In interpreting contracts, a court must "examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract," and in doing so, "[it] will look to the plain and ordinary meaning of the language used in the contract unless another meaning is clearly apparent from the contents of the agreement." *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 2011-Ohio-2720, ¶ 37. If the language in the contract is unambiguous, we must not look beyond the writing. *Id.* "'[A] contract

6

is unambiguous if it can be given a definite legal meaning.'" *Id.*, quoting *Westfield Ins. Co. v. Galatis*, 2003-Ohio-5849, ¶ 11.

**{¶13}** The ownership of the gatekeeper system is the crux of this case because without ownership, Texlo is not entitled to an award of damages for damage done to the system. In evaluating the trial court's decision and Texlo's arguments in favor of its ownership, we must address the question in terms of both Section 6.14 and the bill of sale. We begin with the meaning of "install" under Section 6.14.

i.

**{¶14}** As mentioned (and quoted) above, Section 6.14 gave Texlo the right to install a gatekeeper system, at its own expense, for its use and enjoyment. But the rights that flow from Section 6.14 are premised on a foundation that Texlo must "install" the system in the first place. Unhelpfully, the agreement never defines "install" as it is used in Section 6.14.

**{¶15}** But this presents a straightforward question of contract interpretation. This court must give "[c]ommon undefined words . . . 'their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents' of the agreement." *Sunoco*, 2011-Ohio-2720, at ¶ 38, quoting *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241 (1978), paragraph two of the syllabus. Neither party, for their part, advances a precise definition of "to install" in their appellate briefs. Without any such guidance or any indication from the agreement as to what "install" might mean to the parties, we turn to common definitions. The dictionary defines "to install" as "to set up for use or service." *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/install (accessed Oct. 10, 2024) [https://perma.cc/XXW9-RM99]; *see also Oxford English Dictionary Online*, https://www.oed.com/search/dictionary/?scope=Entries&q=

7

install&tl=true (accessed Dec. 2, 2024) [https://perma.cc/GG5H-N74N] ("To place (an apparatus, a system of ventilation, lighting, heating, or the like) in position for service or use.").

**{¶16}** These common definitions of "install" comport with the parties' understanding of the disputed term at oral arguments and how the term is commonly understood. Based on this definition, Texlo was required to "set up" its own gatekeeper system in order to enjoy the benefits and rights of ownership under Section 6.14.

**{¶17}** However, the trial court took a different approach. It explicitly held that Texlo's mere *use* of the system amounted to the installation of the system. But the trial court's holding directly contravenes the plain meaning of "install." In fact, Texlo freely acknowledged in oral arguments that the mere use of the gatekeeper system did not amount to installation under Section 6.14 of the parties' agreement. In essence, Texlo conceded that it did not "install" the gatekeeper system.

**{¶18}** And that concession honors the plain language of the parties' agreement. The gatekeeper system was already there when Texlo arrived. Texlo used the previous tenant's gatekeeper wire and did not install any part thereof. Therefore, Texlo could not have owned the gatekeeper system under Section 6.14 of the agreement, which only addressed the systems that Texlo installed itself.

**{¶19}** With this contractual avenue unavailing, Texlo must pursue its ownership claim elsewhere in the agreement.

ii.

**{¶20}** We next consider the bill of sale to see if that instrument transferred ownership of the gatekeeper system to Texlo, entitling it to damages and other associated ownership rights. As explained above, the bill of sale transferred ownership

8

to Texlo of all equipment identified in Exhibit G of the parties' original agreement. This again presents a pure issue of contract interpretation.

**{¶21}** Exhibit G is a highly specific, three-page, single-spaced list consisting of 97 pieces of equipment in which Gator transferred its ownership. This list covers everything from the significant (a 20' x 20' dairy cooler) to the mundane (bug lights and ketchup dispensers). But nowhere in this detailed list do we see anything about the gatekeeper system. Texlo nevertheless implores us (as the trial court did) to read the gatekeeper system into Exhibit G despite its conspicuous absence. Specifically, Texlo urges us to consider the language in the bill of sale that says the transfer of ownership "included, but [was not] limited to" the items in Exhibit G. But we may not read that language so broadly so as to render meaningless the extensive list that the parties negotiated and included in their agreement. *See Wohl v. Swinney*, 2008-Ohio-2334, ¶ 22, citing *State v. Bethel*, 2006-Ohio-4853, ¶ 50 ("When interpreting a contract, we will presume that words are used for a specific purpose and will avoid interpretations that render portions meaningless or unnecessary."). If the exhibit was read the way Texlo desires, anything in the store, from the air conditioning units to the tiles on the floor, could be subsumed within the list notwithstanding the specificity of Exhibit G.

**{¶22}** We cannot view the exclusion of the gatekeeper system from Exhibit G as an oversight, particularly given the fact that the gatekeeper system warranted an entirely separate contractual provision in Section 6.14. *See Nour v. Shawar*, 2014-Ohio-3016, ¶ 14 (10th Dist.), quoting *Bank of N.Y. Mellon v. Rankin*, 2013-Ohio-2774, ¶ 31 (10th Dist.) ("'[C]ontracts must be read as a whole, and individual provisions must not be read in isolation.'"); *see also Wildcat Drilling, L.L.C. v. Discovery Oil & Gas, L.L.C.*, 2023-Ohio-3398, ¶ 24, quoting *State ex rel. Paluf v. Feneli*, 1994-Ohio-325

9

("The parties' intention to abrogate the common-law notice requirements for indemnification is also evidenced by the inclusion of notice provisions in other areas of the contract. 'Expressio unius est exclusio alterius is an interpretive maxim meaning that if certain things are specified in a law, contract, or will, other things are impliedly excluded.'"). We must construe the contract as a whole, and respect the choices made by the parties in their agreement.

**{¶23}** Considering the plain language of Section 6.14 and Exhibit G, the bill of sale did not purport to transfer the gatekeeper system to Texlo. For the reasons stated above, we therefore hold that the trial court erred as a matter of law in finding Texlo owned the gatekeeper system and was entitled to the rights of ownership, as neither Section 6.14 nor the bill of sale bestowed such rights upon Texlo. Accordingly, we sustain Gator's second assignment of error. This disposition requires us to also sustain Gator's fourth assignment of error as it pertains to the damages awarded to Texlo on the basis that it owned the gatekeeper system.

III.

**{¶24}** Based on the foregoing analysis, we sustain Gator's second and fourth assignments of error, reverse the judgment of the trial court, including the damages awarded to Texlo, and remand this cause for entry of judgment in Gator's favor on the contract claim concerning the gatekeeper system. The disposition of the second and fourth assignments of error renders the first and third assignments moot.

Judgment accordingly.

**CROUSE** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.

10