[Cite as *Owens v. Owens*, 2025-Ohio-359.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| ROBERT M. OWENS | : | JUDGES: |
| | : | |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff | : | Hon. W. Scott Gwin, J. |
| | : | Hon. John W. Wise, J. |
| -vs- | : | |
| | : | Case Nos. 23 CAF 110102 |
| | : | 24 CAF 010007 |
| TERI M. OWENS | : | |
| | : | |
| Defendant-Appellee, | : | |
| Cross-Appellant | : | O P I N I O N |
| | | |
| -vs- | | |
| | | |
| HOMELIFE IN THE GARDENS, LLC, | | |
| ET AL,. | | |
| | | |
| Third Party Defendants-Appellants, | | |
| Cross-Appellees | | |

CHARACTER OF PROCEEDING: Appeal from the Delaware County Court of Common Pleas, Domestic Relations Division, Case No. 19 DRA 01 0006

JUDGMENT: Affirmed

DATE OF JUDGMENT ENTRY: February 3, 2025

APPEARANCES:

For Defendant-Appellee,
Cross-Appellant:

Nicholas Vesha
38 S. High St.
Dublin, Ohio 434017

For Third Party Defendant-Appellant,
Cross-Appellee:

Timothy J. Owens
2200 Riverside Dr., Suite 125
Upper Arlington, Ohio 43221

*Delaney, P.J.*

{¶1} Third Party Defendants-Appellants and Cross-Appellees HomeLife in the Gardens, LLC, and Donald E. Rankey, Jr., have appealed a Judgment Entry and Order entered in the Delaware County Court of Common Pleas, Domestic Relations Division Case No. 19 DR A 01 0006, entered on October 30, 2023. Defendant-Appellee and Cross-Appellant Teri Owens has cross appealed.

{¶2} Third Party Defendants-Appellants and Cross-Appellees HomeLife in the Gardens, LLC, and Donald E. Rankey, Jr., have also appealed a Judgment Entry and Order entered in the same domestic relations case entered on December 27, 2023. Because the parties are the same and the issues closely related, this Court consolidated the appeals.

## FACTS AND PROCEDURAL HISTORY

{¶3} In 2019, Robert Owens filed for divorce from his wife, Teri Owens, in the Delaware County Court of Common Pleas, Domestic Relations Division. During the proceedings, Ms. Owens sought to recover marital assets including Mr. Owens' business interests. She subsequently named two companies, HomeLife in the Gardens, LLC ("Gardens"), and HomeLife on Glynco, LLC ("Glynco"),[1] as third party defendants. She alleged that Mr. Owens had a membership interest in each company, giving her a marital interest.

---

[1] At the close of Ms. Owens' case at trial, the trial court granted a motion for directed verdict in favor of Glynco and Mr. Rankey. None of the assignments or cross assignment of error relate to the dismissal of Glynco. Accordingly, this Opinion will focus on HomeLife in the Gardens.

{¶4}   During their marriage, Mr. Owens was an attorney with Owens Law Office. Ms. Owens worked in the office and had personal knowledge of his practice.

{¶5}   Mr. Owens met the  President and CEO  of HomeLife Properties, Ltd. ("HomeLife"), Donald E. Rankey, Jr., when he rented office space from HomeLife. HomeLife manages retirement communities such as independent care and assisted living facilities. After the two became acquainted, Mr. Rankey gave Mr. Owens the opportunity to represent one of his companies. Mr. Owens performed well, and Mr. Rankey began discussing how Mr. Owens might become involved with one of HomeLife's potential assisted living properties.

{¶6}   Mr. Rankey became aware of an independent care and assisted living facility located in New Orleans, Louisiana, called The Gardens. The facility had been placed on a "troubled project list" by the Department of Housing and Urban Development. Homelife obtained a management agreement for the facility and subsequently began the process of purchasing the property. HomeLife in the Gardens, LLC, was formed as a limited liability company to acquire and operate the facility in New Orleans. Articles of Organization were filed with the Ohio Secretary of State on September 24, 2012, and with the Louisiana Secretary of State.[2] On the same day, the members of the company executed an Operating Agreement. The sale of the property took place in 2013.

{¶7}   Seven Members formed the company. The Operating Agreement listed the name of each member, the initial capital contribution of each, and the percentage interest each received. It listed Mr. Owens' capital contribution as $50,000 and percentage interest as 5%.

---

[2] The Operating Agreement spells the company's name as HomeLife. We have used that spelling in this Opinion.

{¶8} Five of the Members made cash contributions, and the word "cash" was written next to the amount of their initial capital contributions. Two of the members, HomeLife, and Mr. Owens did not have the word "cash" written next to their contributions. In several other sections, the Operating Agreement specified that "HomeLife shall be obligated to make a Capital Contribution in the form of the Deferred Acquisition Fee." Its initial Capital Contribution was listed as $500,000.

{¶9}   In the Operating Agreement, Article 14, Section 14.20 Counsel to the Company, provided that the "Company has initially selected Owens Law Office, Delaware, Ohio ("OLO") as legal counsel to the Company." It further provided:

> Each Member further acknowledges that (i) OLO has represented, and continues to represent, HomeLife in various legal matters not related to the Company, and (ii) OLO has represented, and continues to represent, the interests of HomeLife in connection with the formation of the Company, and the preparation and negotiation of this Agreement and related matters.

With respect to Mr. Owens' initial Capital Contribution, the agreement did not expressly specify what non cash property or services constituted that contribution and whether they had been performed or would be ongoing.

{¶10} According to Mr. Rankey, Mr. Owens' capital contribution was to be a future, in kind contribution of legal services equivalent to $50,000. He maintained that Mr. Owens never provided the in-kind services as expected. A long time employee of Homelife testified that she prepared various HUD documents for the acquisition, work that Mr. Rankey testified Mr. Owens was to have done "to earn the 5% membership interest." She also testified that Mr. Owens submitted invoices for the work he did for Gardens and was paid for that work.

{¶11} Ms. Owens testified that Mr. Owens "was to do the legal work for the formation and negotiation and preparation" of Gardens. It was her position that the work representing his initial capital contribution had been completed.

{¶12} At trial, Mr. Rankey described a deteriorating relationship between the company and Mr. Owens. In 2016, Mr. Rankey informed Mr. Owens that he was going to reduce his percentage interest from 5% to 2% based on Section 5.2(b)(1) of the Operating Agreement. That section provides "Manager shall have full and complete authority with respect to any of the following matters: (1) admit any new or Substitute member." In section 5.1, the Operating Agreement appointed Mr. Rankey as the sole manager.

{¶13} The dilution was reflected in Mr. Owens 2016 K-1 tax form and he did not challenge the decision. The trial court noted that, other than the K-1 form, there was no evidence of the transaction or any agreements that may have been made. The 3% was given to another original member, an architect who had done work for Gardens.

{¶14} Four years later, in 2020, Mr. Rankey claimed the remaining 2% interest of Mr. Owens' interest because, according to him, Mr. Owens had not provided any in-kind legal services. The only documented notice to Mr. Owen of this forfeiture was a 2020 K-1 tax form that was prepared on May 26, 2021. The 2% interest was given to Mr. Rankey's son, who worked for Gardens.

{¶15} Prior to the 2020 K-1 being issued, Gardens had entered into a contract on February 9, 2021, to sell the facility. The owners approved the purchase price of $10,400,000 dollars with a closing date of July 16, 2021. Mr. Owens was not present for the vote and did not receive any funds from the sale.

{¶16} During the course of litigation between Ms. Owens and Gardens, she came to learn that Mr. Rankey might have transferred the 2% interest funds to his own account. She then filed a separate complaint against him in which she attempted to pierce the corporate veil and hold him personally liable.

{¶17} Given the nature of the claims, the parties agreed to bifurcate the divorce trial from the third party trial. On September 19, 2023, the trial court conducted a one day trial. At the close of Ms. Owens' case in chief, the court dismissed her claims against Glynco and Mr. Rankey. On October 30, 2023, it issued a Judgment Entry and Order in which it determined that Mr. Owens' interest was taken without compensation and it awarded Ms. Owens $26,713.13 on her claim against Gardens. It also awarded Gardens $7,203 in legal fees as a result of a *lis pendens* action filed in Louisiana prior to the sale.

{¶18} After the conclusion of the trial, Mr. Rankey filed a motion for an evidentiary hearing. He sought damages alleging that Ms. Owens' naming him individually in an attempt to pierce the corporate veil amounted to frivolous conduct. The trial court denied the motion. In its Judgment Entry and Order dated December 27, 2023, it concluded that Ms. Owens took an "understandable position" even though she was ultimately unsuccessful. It also determined that given the connection between Homelife, Gardens, and Mr. Rankey, the claims were "essentially the same" and "any legal fees and costs would be de minimis."

{¶19} In appellate Case No. 24CAF110102, Gardens appealed the Judgment Entry and Order for the trial court's award of $26,713.13 to Ms. Owens. Ms. Owens cross appealed for the $7,203 in legal fees awarded to Gardens. In Case No. 24CAF 010007,

Mr. Rankey appealed the Judgment Entry and Order for failing to grant him an evidentiary hearing on his motion for sanctions.

<u>Case No. 24 CAF 110102</u>

**GARDEN'S ASSIGNMENTS OF ERROR**

I. THE TRIAL COURT ERRED AS A MATTER OF LAW IN FINDING THAT APPELLEE TERI OWENS WAS ENTITLED TO AN AWARD OF $26,713.13 BASED ON A DISTRIBUTION OF A 2% ECONOMIC INTEREST IN THE NET PROFITS OF HOMELIFE IN THE GARDENS, LLC (EXHIBIT A TO THE BRIEF, OCTOBER 30, 2023 JUDGMENT ENTRY ORDER OF THE TRIAL COURT AT PAGE 10).

II. THE TRIAL COURT'S FINDING THAT APPELLEE TERI OWENS WAS ENTITLED TO AN AWARD OF $26,713.13 BASED UPON A DISTRIBUTION OF A 2% ECONOMIC INTEREST IN THE NET PROFITS OF HOMELIFE IN THE GARDENS, LLC WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**MS. OWENS' CROSS ASSIGNMENT OF ERROR**

I. THE TRIAL COURT ERRED IN FINDING MS. OWENS ABUSED PROCESS.

**ANALYSIS**

I.

{¶20} In its first assignment of error, Gardens has argued that the trial court erred as a matter of law in awarding Ms. Owens $26,713.13 based on a 2% interest in the net profits of Gardens. It maintained that, pursuant to the Operating Agreement, Mr. Owens agreed to provide future legal services as consideration for his membership interest and

that, because he did not provide those services, Gardens was not required to perform its obligations under the Operating Agreement.

{¶21} Gardens acknowledged that the "specific contribution to be made by R. Owens is undefined," but asserts testimony made it "clear" that he was to provide $50,000 worth of future legal work." It further claimed that this was corroborated by Ms. Owens' testimony that she would send "credit statements" reflecting "ongoing work."

{¶22} Gardens quoted R.C. 1705.01(J)[3] which defined an operating agreement as "all of the valid written or oral agreements of the members . . . as to the affairs of a limited liability company and the conduct of its business."  It coupled that with R.C. which provided "A promise by a member to contribute to the limited liability company is not enforceable unless it is set forth in a writing signed by the member." Read together, Gardens concluded that the Operating Agreement consisted of both the written agreement and the "contemporaneous oral agreement" that "required" the future legal services.

{¶23} We begin our analysis, as the trial court did, with a review of the Operating Agreement. Because the construction of the written contract is a matter of law, our review is *de novo*. *Jariwala v. Patel*, 2023-Ohio-950, ¶ 30 (5th Dist.), citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, paragraph one of the syllabus (1978).

{¶24} When confronted with an issue of contract interpretation, we examine the contract as a whole and give effect to the intent of the parties. *Westfield Ins. Group v. Affina Dev., L.L.C.,* 2012-Ohio-5348, ¶ 21 (5th Dist.). This includes looking to the plain

---

[3] Both sides recognized that R.C. 1705 has been repealed but agree it was in effect at times relevant to this case. The sale of Gardens took place on July 16, 2021. The Ohio Revised Limited Liability Company Act (Revised Act), R.C. 1706 took effect on February 12, 2022.

and ordinary meaning of the language used in the contract, unless another meaning is reflected in the contents. *Id.* We presume that the intent of the parties is reflected in the language they chose. *Id.* When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties. *Id.* "As a matter of law, a contract is unambiguous if it can be given a definite legal meaning." *Sunoco, Inc. (R & M) v. Toledo Edison, Co.*, 2011-Ohio-2720, ¶ 37, citing *Westfield Ins. Co. v. Galatis,* 2003-Ohio-5849, ¶ 11.

{¶25} The Operating Agreement reflected that there were seven original Members. Mr. Rankey signed his name under HomeLife Properties, Ltd. and wrote "Managing Member" by the title line. Mr. Owens noted his title as "Robert Owens, personally." The agreement defines "Member" as "each of the persons who has executed this Agreement and each of the persons who may hereafter become additional Members or Substitute Members as provided in this agreement."

{¶26} On the next page, captioned Exhibit A to the agreement, the members were listed with their Capital Contributions and their Percentage Interest. Capital Contributions were defined in Article 1, Definitions, Section 1.8 as "the aggregate amount of cash or fair market value of property contributed by a Member to the Company from time to time and, with respect to HomeLife, shall include the Deferred Acquisition."

{¶27} There is no question that Mr. Owens' name was listed as a Member on the Operating Agreement. To be a member of a limited liability company, a person's name must appear on the company records as one who shares in the company's profits and losses and has a right to receive distributions from the company. *Stanfield v. On Target Consulting, LLC*, 2017-Ohio-8830, ¶ 6 (1st Dist.). Further, an operating agreement is the

record that sets forth the membership interests of the parties and is the appropriate document to consider when determining the identity of the members of a limited liability company. *Matthews v. D'Amore*, 2006-Ohio-5745, ¶36 (10th Dist.). The principal office of a limited-liability company is required to keep certain records, including a list of current members and all amendments to an operating agreement. *Stanfield* at ¶ 9. Documentation is crucial and can affect the liabilities of the members. *Id.*

{¶28} Of the seven members, five were noted to have made a cash capital contribution. Neither HomeLife Properties, Ltd. or Mr. Owens had the word "cash" noted next to their listed capital contribution. HomeLife's contribution was specified in the agreement as a $500,000 deferred acquisition fee.

{¶29} The agreement expressly named Mr. Owens' law firm as "Counsel to the Company" and referenced the scope of its representation.  It states, in part:

> Company has selected Owens Law Office, Delaware, Ohio ("OLO") as legal counsel to the Company. . . . Each member further acknowledges that (i) OLO has represented, and continues to represent, HomeLife in various legal matters not related to the Company, and (ii) OLO has represented, and continues to represent, the interests in HomeLife in connection with the formation of the Company, and the preparation and negotiation of this Agreement and related matters.

Operating Agreement, Article 14, Miscellaneous, Section 14.20 <u>Counsel to the Company</u>. It did not, however, tie that in any way to the Mr. Owens' personal percentage interest.

{¶30} We agree with the trial court that nowhere in the Operating Agreement does it state that Mr. Owens is required to do any future work for the 5% interest granted to him. The document does not identify his capital investment, other than it was not in cash. Pursuant to the version of the Ohio Revised Code that was in effect at the time the agreement was executed, any promise made by a  member to contribute was not enforceable unless it was in writing. R.C. 1705.09(B).

{¶31} Gardens recognized Mr. Owens' percentage interest in tax documents over the years. It continued to issue 401-K tax forms using the 5% interest until 2015 when Gardens took 3% of Mr. Owens' interest and gave it to another member. The 401-K forms are the only written documentation for this act. It is important to note that the Operating Agreement itself was never amended to remove Mr. Owens from membership or to reflect any reduction in his interest.

{¶32} The trial court noted that Mr. Owens did not refute the reduction of his interest to 2%. It concluded that "[w]hat agreements were made with him regarding the transfer have not been documented by any exhibits provided to this Court. Be that as it may, having no proof of a challenge by Mr. Owens, this Court will confine its analysis to the remaining 2%."

{¶33} Gardens noted that although parol evidence is inadmissible in Ohio to vary the terms of a written contract, evidence of a collateral oral contract is admissible if it covers matters that are distinct from, yet closely related to, the subject of the written contract. It maintains that the court should have considered evidence to determine that Mr. Owens' percentage interest was based on an oral agreement to provide future legal services in the amount of $50,000. Had it done so, Gardens claims it would have had a defense to Ms. Owens' claim because Mr. Owens admitted he did not provide such services.

{¶34} The parol evidence rule states that "'absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreement.'" (Citation omitted.) *Galmish v. Cicchini,* 90 Ohio

St.3d 22, 27 (2000). Despite its name, the parol evidence rule is not a rule of evidence, nor is it a rule of interpretation or construction. *Charles A. Burton, Inc. v. Durkee*, 158 Ohio St. 313, 324 (1952). 'The parol evidence rule is a rule of substantive law which, when applicable, defines the limits of a contract.' *Id.,* paragraph one of the syllabus.

{¶35} Gardens relies on *Sparhawk v. Gorham,* 101 Ohio App. 362 (9th Dist. 1956), for the proposition that parol evidence of a contemporaneous oral agreement may be provided when the agreement was made to induce a party to enter into a written contract. In that case, the court stated:

> although the general rule is that parol evidence is inadmissible to vary the terms of the written contract, * * * there may be cases where parol evidence is admissible to prove a separate oral agreement constituting a condition precedent to the signing of the written instrument and where such condition precedent is proven and a separate agreement is breached by one of the parties, such breach may be a defense to the enforcement of the written contract. *Since the written contract is admitted by all of the parties and the court recognized the proper legal principles applicable, the only remaining question is a factual one as to whether or not the collateral agreement was entered into.* (Emphasis added.)

*Id. at* 364, quoting *Roan v. Hale*, 60 Ohio Law Abs. 559, 560 (2d Dist. 1956).

{¶36} It is important to note that Gardens did not argue that they were unable to present evidence because of the parol evidence rule. Mr. Rankey testified that there were specific HUD documents that Mr. Owens was supposed to do. The long time employee who testified stated Mr. Owen, like her, was expected to make in kind contributions. These expectations, however, are not sufficient to demonstrate that a collateral agreement was entered.

{¶37} The trial court directly addressed Gardens argument that the 5% share was contingent. It concluded "nowhere in the forty-two (42) page Operating Agreement does it state that Mr. Owens is required to do any future work for the 5% granted to him

in the Operating Agreement." No number of hours, hourly rate, or number of years required to continue to perform legal services were to be found in the agreement. Moreover, it concluded that "[t]here is no such document in this case." Careful reading of the Judgment Entry and Order reveals that the trial court did not reject Gardens' argument regarding an alleged oral agreement because of the parol evidence rule, it rejected the argument because the Ohio Revised Code requires that any promise by a member to make a contribution to a limited liability company must be in writing signed by the member. The Operating Agreement contemplated Mr. Owens performing work for the company as its named counsel, but there was nothing in writing that evidenced an agreement to condition his initial Capital Contribution to an amount of future work.

{¶38} While it is true that a limited liability company can have an oral operating agreement, Ohio law requires that certain documents pertaining to limited liability company members must be in writing. For example, when adding new members there must be written consent to add a new member and, an absolute necessity, a writing stating the membership interest and designating the sharing of profits and losses and distributions. *Boyles v. Kanz*, 2020-Ohio-1222, *¶23* (5th Dist.).

{¶39} Even if there had been an oral agreement to make the membership conditional, Gardens was not authorized to remove the remaining 2% interest and expel Mr. Owens' membership in the manner in which it did.

{¶40} Under the prior act, R.C. 1705, removal of a member was left primarily to the operating agreement. R.C. 1705.15(B) addressed termination of a membership and provided:

> [A] person ceases to be a member of a limited liability company upon the occurrence of any of the following events of withdrawal . . . . A member is removed or expelled as a member in accordance with the operating agreement.

The section differentiated between why a member may be removed and the mechanism for doing so which was to be determined by the operating agreement.

{¶41} Gardens relied on Article 5.2(a) and (b) of the "Management Section" in the Operating Agreement for the authority to terminate Mr. Owens' membership. Those sections provided that, as manager, Mr. Rankey "shall have full and exclusive right and authority to take all actions which it deems necessary, useful or appropriate for the exercise of the company's powers and the management and conduct of the company's business." They also provided that he, as manager, "shall have full and complete authority with respect to any of the following matters: (1) admit any new or Substitute Member."

{¶42} Although Mr. Rankey had the authority to act on behalf of Gardens, the agreement did not contemplate allowing him to simply take an ownership interest from one member and give it to another without the proper decision making and documentation. For example, Section 5.2(a) required that:

> All instruments, contracts, agreements and documents of whatsoever type executed on behalf of the Company after approval by the Manager or Board of Managers shall be executed in the name of the Company by one (1) or more Managers.

Similarly, Section 10.3 required that a member may not transfer his interest "without express written permission from the Manager" and unless the "transferee agrees in writing."

{¶43} Perhaps more problematic is that Mr. Rankey did not follow the right of first refusal found in Section 10.4 which states:

10.4 <u>Right of First Refusal.</u> (a) No transfer unless into Trust or similar estate planning entity, voluntarily or involuntarily, shall be made or permitted by a Member of all or any portion of its Membership Interest unless such interest is first offered to the other members in proportion to their ownership shares of any Member so interested in exercising said purchase and such Members shall refuse or otherwise fail to purchase such interest upon the terms and conditions set forth in this Section 10.4. Any event deemed to be a withdrawal pursuant to Section 10.1 shall be deemed a transfer for purposes hereof. The offer shall be in writing and shall identify the Membership Interest, and if applicable, state the purchase price and any other terms and conditions upon which such interest is offered. In any event, an offer shall be deemed made as of the 30th day following receipt by the other Member of actual notice of the event comprising the transfer. Any offer made pursuant hereto may be accepted by the other Member(s) in writing given not later than the 60th day after the offer is received or deemed made.

{¶44} After duly considering the Operating Agreement and the record, this Court concludes that Mr. Owen was a member as defined by the Operating Agreement. The language of the agreement did not support a promise for future legal services that made his membership contingent on him providing them. Gardens did not properly dissociate him as a member. Accordingly, the trial court did not err as a matter of law when it awarded Ms. Owens an award of $26,713.13 based on Mr. Owens' 2%. Gardens first assignment of error is overruled.

II.

{¶45} In its second assignment of error, Gardens has argued that the trial court's award of $26,713.13 based upon Mr. Owens' 2% economic interest in the net profits of the Gardens' sale was against the manifest weight of the evidence. It pointed to the fact that it is undisputed that Mr. Owens' capital contribution was not made in cash. It maintained that he did not provide $50,000 in legal services, either before or after executing the Operating Agreement. It has argued that there was testimony that no credit statements were issued showing in kind services, and that Mr. Owens was paid for the

services he performed. It further argued that Mr. Owens' work was of poor quality and insufficient for the needs of the company.

{¶46}  In addressing a manifest weight of the evidence claim, a reviewing court is to examine the entire record and determine "whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered." (Citation omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20; *see also Sheet Metal Workers Local Union No. 33 v. Sutton*, 2012-Ohio-3549 (5th Dist.). The evidence on each element must satisfy the burden of persuasion or weight. *Eastley* at ¶ 20.

{¶47} An appellate court does not operate as a fact finder. *Markel v. Wright*, 2013-Ohio-5274 (5th Dist.). It neither weighs the evidence nor judges the credibility of witnesses. *Id.* It does do not substitute its judgment for that of the trial court when competent and credible evidence exists to support the trial court's findings of fact and conclusions of law. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The underlying rationale for giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. *Id.* Accordingly, a trial court may believe all, part, or none of the testimony of any witness who appears before it. *Rogers v. Hill*, 124 Ohio App.3d 468 (4th Dist. 1998).

{¶48} In this case, the trial court held a trial and was able to evaluate the evidence and the witnesses' credibility. In reaching its decision, it noted that, while there was documentation of other interest transfers regarding other members, there was none

for the two times Mr. Owens' interest was reduced and removed. There was no written document to establish an agreement to provide in kind legal services that would reflect hours expected or a value of the hourly rates. The court questioned Gardens decision to pay for Mr. Owens legal services when the expectation was that they would be in kind.

{¶49} The court reviewed the documents provided at trial, including the 401-K forms issued to Mr. Owens which reflected shares of interest. There was evidence that the final 401-K, the only document that purportedly removed Mr. Owens' membership, was delivered "nearly four (4) months after the contract for sale of property and shortly before the $10,000,000 sale." There was evidence that Mr. Owens did not receive any funds from the sale and that Gardens did not take the proper steps to dissociate Mr. Owens from membership.

{¶50} After reviewing the record, this Court determines that there was competent credible evidence for the trial court to find that the Mr. Owens had a valid 2% membership interest in Gardens at the time of the sale. We further determine Gardens' attempted to remove him as a member without following the mechanism set forth in the Operating agreement and without compensation. The second assignment of error is overruled.

CROSS ASSIGNMENT OF ERROR

I.

{¶51} In her sole assignment of error, Ms. Owens has argued that the trial court erred as a matter of law by granting an abuse of process counterclaim against her. In addition, she has claimed the trial court abused its discretion in its findings of fact regarding her use of *lis pendens* claim.

{¶52} After the third parties had been added, the trial court amended its mutual restraining order to add Gardens to it. She spoke with the real estate brokers selling the property and that "she was in favor of the sale and would cooperate, but that [Gardens] was a party to her divorce case and they needed to abide by the Delaware County Court's jurisdiction." She then retained legal counsel in Louisiana and recorded a *lis pendens* notice in the state of Louisiana, with a copy in the Delaware County docket. She cancelled the *lis pendens* on June 18, 2021, prior to the sale on July 16, 2021. The doctrine of *lis pendens* is codified in R.C. 2703.26. It states:

> When a complaint is filed, the action is pending so as to charge a third person with notice of its pendency. While pending, no interest can be acquired by third persons in the subject of the action, as against the plaintiff's title.

R.C. 2703.26. The intent and effect of *lis pendens* is "to charge third persons with notice of the pendency of an action, and to make any interest acquired by such third persons subject to the outcome and judgment or decree of the pending lawsuit." *Tax Ease Ohio, LLC v. Living Care Alternatives of Kirkersville*, 2024-Ohio-439, ¶ 14 (5th Dist.), citing *Bank of N.Y. v. Barclay*, 2004-Ohio-1217 (10th Dist.). The purpose is to protect the plaintiff's interest in the property at issue. *Bradford v. Reid*, 126 Ohio App. 3d 448, 452 (1st Dist.1998).

{¶53} *Lis pendens* requires the following: (1) the property be of a character subject to the rule; (2) the court have jurisdiction over both the person and the property; (3) the property be sufficiently described in the pleadings; and (4) the property be directly affected by the judgment in the pending suit. *Cook v. Mozer*, 108 Ohio St. 30, 37 (1923); *Katz v. Banning*, 84 Ohio App.3d 543 (1992). The fourth element is met when the property

described is "'at the very essence of the controversy between the litigants.'" *Katz* at 548, quoting *Levin v. George Fraam & Sons, Inc.*, 65 Ohio App.3d 841, 846 (1990).

{¶54} In this case, Ms. Owens could not satisfy the fourth prong of the *lis pendens* doctrine. She did not have any interest in the title of the property to be conveyed. Her interest was only in marital property. Her action to recover a marital asset was based on the Operating Agreement, not an ownership interest in the property. The Operating Agreement specifically states: "2.8 Ownership The interest of each member in the Company shall be membership shares held as personal property for all purposes." As such, her claim did not directly affect the property.

{¶55} An action for money damages is not subject to the equitable doctrine of *lis pendens.* See *Katz* at 548*; Pournaras v. Hopkins*, 11 Ohio App.3d 51, 52 (1983); *Stone v. Equitable Mtge. Co.*, 25 Ohio App. 382, 388 (1927). Even if the sale of the property was the source from which a plaintiff may be compensated, this is an indirect effect on the property, not a direct effect sufficient to invoke the doctrine of *lis pendens. See Levin* at 846.

{¶56} Because Ms. Owens' request for recovery in her third party complaint did not directly affect the property, *lis pendens* did not apply. The question remains then whether her filing such a claim was an abuse of process.

{¶57}  There are three elements of the tort of abuse of process. They are: (1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use

of process. *Yaklevich v. Kemp, Schaeffer & Rowe Co., L.P.A.,* 1994-Ohio-503, paragraph one of the syllabus; *Hubbard v. AASE Sales, LLC*, 2018-Ohio-2363, ¶34 (5th Dist.).

{¶58} Ms. Owens has argued that the trial court erred as a matter of law in finding an abuse of process because she has claimed filing a *lis pendens* is not, of itself, a process. She urges this Court to adopt the holding of *Bonnie Braes Farms, Inc. v. Robinson*, 598 S.W.2d 765, 766 (Ky. Ct. App. 1980).

> We do not find a lis pendens notice to be within this definition. The lis pendens is merely a notice required by statute to protect the interests of any subsequent purchasers. It is filed without intervention of the judicial authority and brings neither the property nor any parties before the court. Since there is no process, there can be no abuse of process.

{¶59} While it may serve as notice, the notice at issue is dependent on a complaint being filed and a pending action. Moreover, beyond providing notice of the pendency of an action, its purpose is to make any interest acquired third person subject to the outcome and judgment of the pending lawsuit. *See Tax Ease Ohio, LLC,* 2024-Ohio-439, at ¶ 14.

{¶60} Ms. Owens takes exception with the trial court's holding that her "use of the *Lis Pendens* was to accomplish an ulterior purpose to prevent the sale of the property for which the restraining order was not designed." She has argued that this was both an error of law and fact because she did not want to stop the sale.

{¶61} In its order, the trial court looked to the entirety of the proceeding involving the *lis pendens* action in Louisiana. The action was based on the mutual restraining order filed in the divorce case on April 8, 2021. The *lis pendens* was filed on June 10, 2021. The court determined that Gardens did not have presumptive service until June 18, 2021. As a result, it did not have notice of the claims or of the restraining order. It reiterated that

the property in Louisiana was not a marital asset. The court determined that Ms. Owens was attempting to stop the sale using the mutual restraining order issued in the divorce case. Although Ms. Owens repeatedly stated she was not trying to stop the sale, one of the purposes of the mutual restraining order was to prohibit the parties of selling, giving away, or removing marital assets.

{¶62} Ms. Owens stated in a letter that her "goal is to reach a written agreement with HomeLife as to Mr. Owens' proceeds which might include placing them in escrow." This serves as other indicia that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed. She was using the *lis pendens* to force an agreement and to dictate how the proceeds from a sale that she had no standing to affect how the proceeds would be handled.

{¶63} A review of the *lis pendens* action reveals it was an attempt to affect the sale, either through using a third party sale to force an agreement as to how the proceeds would be handled or it by placing the parties in a situation where the buyer stopped the sale. The trial court did not commit an error of law or fact when it determined that the *lis pendens* action was improperly instigated and amounted to an abuse of process. Ms. Owens' cross assignment of error is overruled.

<u>Case No. 24CAF010007</u>

**ASSIGNMENT OF ERROR**

I.      THE TRIAL COURT ERRED AS A MATTER OF LAW IN DENYING THE MOTION OF THIRD PARTY DEFENDANT/APPELLANT DONALD E. RANKEY JR. FOR AN EVIDENTIARY HEARING PURSUANT TO R.C. 2323.51 (EXHIBIT B TO THIS BRIEF, DECEMBER 27, 2023

ORDER/JUDGMENT ENTRY OF THE TRIAL COURT AT PAGE 5 AND ITS AWARD OF COSTS AGAINST MR. RANKEY).

## ANALYSIS

{¶64} In the sole assignment of error for Case No. 24CAF010007, Mr. Rankey has argued that the trial court erred in denying him an evidentiary hearing pursuant to R.C. 2323.51 for frivolous conduct in filing a civil claim. R.C. 2323.51 provides that a court may award court costs, reasonable attorney fees, and other reasonable expenses incurred in connection with a civil action to any party who was adversely affected by frivolous conduct. *Almasoodi v. J. Harris Constr. Inc.,* 2023-Ohio-895, ¶ 54 (5th Dist.).

{¶65} A motion for sanctions brought under R.C. 2323.51 requires a three-step analysis by the trial court. The trial court must determine (1) whether the party engaged in frivolous conduct, (2) whether any party was adversely affected by it, and (3) if an award is to be made, the amount of the award. *Bear v. Troyer*, 2016-Ohio-3363, ¶ 55 (5th Dist.). The statute provides a list of four factors whose presence would support a finding of frivolous conduct under R.C. 2323.51(A)(2)(a). Mr. Rankey has argued the following three:

> (i) It obviously serves merely to harass or maliciously injure another party to the civil action or appeal or is for another improper purpose, including, but not limited to, causing unnecessary delay or a needless increase in the cost of litigation.
> . . .
> (iii) The conduct consists of allegations or other factual contentions that have no evidentiary support or, if specifically so identified, are not likely to have evidentiary support after a reasonable opportunity for further investigation or discovery.
> (iv) The conduct consists of denials or factual contentions that are not warranted by the evidence or, if specifically so identified, are not reasonably based on a lack of information or belief.

{¶66} The question of what constitutes frivolous conduct may be either a factual determination, or a legal determination. *Ferron v. Video Professor, Inc.*, 2009-Ohio-3133, ¶ 44 (5th Dist.); *Pingue v. Pingue*, 2007-Ohio-4818, ¶ 20 (5th Dist.). A determination that the conduct is not warranted under existing law and cannot be supported by a good faith argument for an extension, modification, or reversal of existing law requires a legal analysis. *Lable & Co. v. Flowers*, 104 Ohio App.3d 227, 233 (9th Dist.1995). With respect to purely legal issues, we follow a de novo standard of review and need not defer to the judgment of the trial court. *Almasoodi* at ¶ 56. We do find, however, some degree of deference appropriate in reviewing a trial court's factual determinations and will not disturb such factual determinations where the record contains competent, credible evidence to support such findings.

{¶67} In support of his argument that there was no reason to pierce the corporate veil and hold him personally liable, Mr. Rankey cited *Dombroski v. Well-Point, Inc.,* 2008-Ohio-4827, ¶¶ 15-17, which analyzed the three-prong test set forth in *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.,* 67 Ohio St.3d 274, 287. "This test focuses on the extent of the shareholder's control of the corporation and whether the shareholder misused the control so as to commit specific egregious acts that injured the plaintiff." *Dombroski* at ¶ 18. In *Belvedere,* the Court held that the corporate form may be disregarded and individuals held liable for wrongs when:

> (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

*Id.* at paragraph three of the syllabus. All three prongs of the test must be met for piercing to occur. In *Dombroski,* the Ohio Supreme Court clarified that the act must be fraud, an illegal act, or a similarly unlawful act and not one that is merely unjust or inequitable. *Dombroski* at ¶ 29.

{¶68} Mr. Rankey argued that the trial court did not find that he committed any acts that were fraudulent, illegal, or similarly unlawful, or that there was any evidence to support such a claim. He claimed that the trial court's failure to grant it an evidentiary hearing on the issue of a frivolous claim was an error as a matter of law.

{¶69} Ms. Owens had argued to the trial court that Mr. Rankey was personally liable because his actions in divesting Mr. Owens' interest were outside the scope of his duties as Manager of Gardens. The trial court noted that Mr. Rankey did not file a motion to be dismissed from her cause of action. The court pointed out that Mr. Rankey used the money to compensate his son and that the money did not come from the 50% interest that HomeLife had, but rather the 2% that, up to that point, Mr. Owens possessed. The court also distinguished that Mr. Rankey's dilution and then forfeiture of Mr. Owens' interest occurred without any compensation and without any documentation of the approval or authorization of any transfer.

{¶70} Finally, the court reviewed Gardens' many theories regarding Mr. Owens' membership interest. In a motion to dismiss, Gardens stated that Mr. Owens "is not and never has been a member" despite the express language in the Operating Agreement. Next it claimed he lost his interest pursuant to statute because he went through bankruptcy. It then argued that he lost his interest pursuant the Operating Agreement due to his bankruptcy. In response to discovery, it took the position that he had a 2% interest

in the company, but that his interest terminated. Finally, it returned to the argument that he was given a 5% interest for future work, despite no mention of that in the Operating Agreement.

{¶71} The court concluded that "[a]fter the numerous explanations for the dissipation of Mr. Owens' interest in [Gardens], Ms. Owens' argument for piercing the corporate veil is an understandable position." Mr. Rankey's served as President and Manager of HomeLife, he also served as Manager of Gardens. The court noted that Ms. Owens was incorrect about money going directly to Mr. Rankey, but ultimately correct that it went to his son.

{¶72}   Conduct is not made frivolous merely because a party lost a legal battle or a party's factual assertions were incorrect. *Harris v. Rossi*, 2016-Ohio-7163, ¶ 18 (11th Dist.). It is not necessarily frivolous even if a claim is not well-grounded in fact. *Ohio Power Co. v. Ogle,* 2013–Ohio–1745, ¶ 29–30 (4th Dist.). R.C. 2323.51 was designed "to chill egregious, overzealous, unjustifiable, and frivolous action." *Id.* A claim is frivolous if it is absolutely clear that, given the existing law, no reasonable lawyer would argue the claim. *Id.*; Spitzer v. Knapp, 2020-Ohio-399, ¶ 12 (5th Dist.).

{¶73} The trial court did not err as a matter of law when applying the law for frivolous conduct in filing a civil claim. It also applied the correct legal standard for piercing the corporate veil. There was competent credible evidence for it to rely upon in making its determination and we will not disturb its decision as a result. The assignment of error is overruled.

**CONCLUSION**

{¶74} Third Party Defendants-Appellants and Cross-Appellees HomeLife in the Gardens, LLC, and Donald E. Rankey, Jr., assignments of error are overruled. Defendant-Appellee and Cross-Appellant Teri Owens' assignment of error is overruled. The Judgment of the Delaware County Court of Common Pleas is affirmed.


By:  Delaney, P.J.,

Gwin, J. and

Wise, J., concur.